[Cite as *State v. Harris*, 2017-Ohio-2751.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104329

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BYRON HARRIS

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-589543-A

**BEFORE:** Keough, A.J., Kilbane, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** May 11, 2017

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street, Second Floor
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By:   Jeffrey Schnatter
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, A.J.:

{¶1} Defendant-appellant, Byron Harris, appeals his convictions. For the reasons that follow, we affirm.

{¶2} In February 2015, Harris was named in a seven-count indictment charging him with aggravated murder (Count 1), murder (Count 2), two counts of felonious assault (Counts 3 and 4), discharge of a firearm on or near prohibited premises (Count 5), and two counts of a having weapon while under disability (Counts 6 and 7). Counts 1 through 5 contained one- and three-year firearm specifications, and Counts 3 through 5 contained repeat violent offender specifications and notices of prior conviction.

{¶3} Prior to the start of trial, the state dismissed Count 7, and Harris executed a jury waiver on Count 6 and the repeat violent offender specifications and notices of prior conviction attendant to Counts 3 through 5. All other counts were tried before a jury, who heard the following evidence.

{¶4} In the early afternoon of August 17, 2014, Tyler Spaulding was riding the bus home after work. Seated in front of him were three males and a female who, according to Tyler, were talking about robbing him. Fearing for his safety, he called his sister Mary, told her what he had overheard, and asked her to have his brother meet him at the bus stop. Mary testified that she called their brother Isaac Spaulding to meet Tyler.

{¶5} Tyler testified that two of the males — the one with the tattoo under his eye and wearing blue jeans, and the other darker-skinned male with a backpack — got off the bus near East 123rd Street. The other male and the female stayed on the bus.

{¶6} When Tyler got off the bus on Lakeview Road near Save-A-Lot, his brother Isaac and his cousin's girlfriend, Chastity Spencer, were waiting for him. Tyler told them what had happened on the bus. As they were walking away, Tyler and Isaac's brother Harry Spaulding, and friend James Parker, Jr., approached. Although Tyler told them what had happened, he indicated that it was over and to leave it alone.

{¶7} Meanwhile, over on Osceola Avenue, Martinez Hunter was sitting on a porch when he received a call from his sister Mary that someone was trying to rob Tyler. After leaving the residence, he saw three males — one who he knew from the neighborhood as the "CD dude." Martinez testified that the CD dude sells CDs and movies outside USA Food Mart. Because Martinez had worked at USA Food Mart, he had seen the CD dude numerous times. According to Martinez, the CD dude was wearing gray jogging pants with no shirt and carrying a book bag on his back. He also testified that the CD dude has a tattoo on his face. Martinez identified Harris in court as the "CD dude."

{¶8} According to Martinez, one of the other males with Harris was shorter in height with darker skin and dreadlocks; Martinez could not remember much about the third male, except that he was short.

{¶9} Martinez testified that when Harris and the other two men walked by him, Harris said "what's up?" and Martinez, not knowing that the males had been on the bus with his brother Tyler, responded the same. The males continued walking, not knowing that they were about to cross paths with Tyler's group, who were walking toward East 123rd Street.

{¶10} When Tyler saw two of the males from the bus, he pointed them out, and Parker started yelling at them that he wanted to talk to them; when the males did not stop, Parker questioned if they wanted to fight. The males started walking faster, and Tyler and his group of four followed. Within moments, Tyler's group of four grew to five when their friend, Marcus Burton, joined the pursuit.

{¶11} Soon thereafter, Martinez saw Tyler, Marcus, Isaac, Harry, Chastity, and Parker. He could hear Tyler yelling out to him to "stop them," pointing to the group of males and stating that they were the ones who tried to rob him. Martinez then witnessed a transaction between Harris and his friends involving a book bag — Martinez initially testified that he saw Harris retrieve a gun from the bag, but then later said the male with the dreadlocks pulled the gun from the bag. Nevertheless, Harris took possession of the gun.

{¶12} After the transaction, Harris and the other two males started running, and Marcus and Parker chased after them. Martinez also followed as they all ran toward the corner of Phillips Avenue and East 123rd Street by Satellite Cleaners. During the chase, Martinez saw Harris pull the gun off his hip. Martinez testified that the gun was a .38 that he had seen before when Harris was trying to sell it at USA Food Mart.

{¶13} According to Martinez, when Harris pulled the gun, he told Marcus and Parker that Harris had a "little ass gun." Parker was now in between Martinez and Harris, as he cut across Satellite Cleaners' parking lot and ran to the middle of Phillips Avenue. Harris was on the sidewalk about three or four houses down on Phillips Avenue

when he started shooting in the direction of Martinez and Parker. Martinez testified that he heard a bullet go whistling by his ear. According to Martinez, the second gunshot hit Parker's hand, causing Parker to yell out that "It hit my hand." Parker then retreated and took cover behind a tree. However, Harris kept firing while approaching Parker, this time hitting Parker in the arm area. Martinez testified that Harris was approximately three or four feet from Parker and fired the gun again, hitting Parker in the chest, causing Parker to spin around and ultimately collapse in Satellite Cleaners' parking lot. Parker was subsequently pronounced dead at MetroHealth Medical Center.

{¶14} Dr. Joseph Andrew Felo, deputy medical examiner who performed Parker's autopsy, testified about the gunshot wounds to Parker's body. According to Dr. Felo, one wound was consistent with the gun pointed at an angle in a downward direction, and another wound was consistent with the gun being fired straight on. The exit wound of one of the gunshots was consistent with Parker's back up against something, like a tree.

{¶15} A grainy surveillance video was played during Martinez's testimony that showed Parker and his group following another group of individuals across the parking lot of Satellite Cleaners. Martinez described to the jury his location in relation to Parker and the shooter. The jury could see a sudden retreat by the larger group, Parker retreating, and then collapsing in the parking lot. Detective Thomas Lynch also testified about the video, stating that after the first shot and everyone scatters, about 10 to 15 seconds pass and the shooter approaches Parker, who is hiding behind a tree.

{¶16} According to Martinez, he was "right there" next to Parker and witnessed the entire event. Detective Lynch testified that based on Martinez's statement and the surveillance video, Martinez was in the best position to witness the shooting. In fact, Detective James Raynard recovered a .38 caliber casing in front of the third house down on Phillips Avenue — the exact area where Martinez testified that he witnessed Harris firing the gun.

{¶17} Sharon Collins, who lived four houses down from East 123rd Street on Phillips Avenue, testified that she was sitting in her living room when her attention was directed out her front window because she heard shouting. When she looked out her window, she saw a black male wearing gray jogging pants pointing a gun toward the corner of Phillips Avenue and East 123rd Street. She testified that she heard two to four gunshots. She could not recall any more identifying details about the shooter, except that the gun was not a revolver, and she could not identify the shooter at trial.

{¶18} When the police arrived, Martinez was interviewed on scene by Detective Lynch. He told the officers that the shooter had a teardrop tattoo under his right eye, and pointed to his own left eye — the jury saw that Harris has a teardrop tattoo under his left eye. Detective Lynch testified that on the day of the shooting, Martinez described the shooter as a black male with a teardrop tattoo, wearing gray jogging pants with no shirt.

{¶19} Subsequently, Martinez was shown two photo arrays and asked to identify the CD dude — the man who shot Parker. In the first photo array, the photos were generated based on information of a possible suspect, and the second photo array was

generated based on Harris's description. In the first photo array, Martinez identified another male and indicated that he was only 50 percent certain that he knew this individual. Martinez identified Harris in the second photo array. At trial, Martinez testified that the shooter wore gray jogging pants, and he was one hundred percent certain that Harris shot Parker.

{¶20} The state also provided testimony from the five other members of Parker's group who witnessed various parts of the altercation from different vantage points. Each witness provided differing details regarding the identity of the shooter, who was carrying the backpack, and who handed the gun to the shooter.

{¶21} Like Martinez, Isaac knew Harris as the CD man, and stated that Harris shot Parker. Isaac testified that when Parker was trying to "get to the guys," the three guys stopped and did a "transaction" with a book bag. Isaac described the males to the jury along with the roles they played in the transaction — the male with the dreadlocks passed the book bag to the man he knew as the CD guy with the tattoo on his face. According to Isaac, the third guy was of average height and wearing a ball cap. Isaac identified Harris as the CD guy, who he saw pull a gun from inside the book bag and subsequently shoot Parker.

{¶22} However, Isaac was cross-examined with the formal written statement he provided to the police shortly after the murder. His statement provided that he did not know any of the males. Isaac testified that his statement was not true. Additionally, in his statement, he described the males to the police: (1) 15-18 years old, tall, slim to

medium build, braided black hair, with a tattoo on the right side of his face, wearing camouflage pants and an orange shirt carrying a backpack; (2) 18-year-old male, caramel skin color, wearing burgundy pants and a white and black shirt, and a ball cap; (3) under 20 years old, black male, average build wearing a blue shirt and black jean shorts. Additionally, the jury heard that Isaac told the police that he did not see any of the males with a weapon. Again, Isaac told the jury that his statement was not true.

{¶23} While Martinez and Isaac unequivocally identified Harris as the shooter, Marcus Burton and Harry Spaulding testified that Harris was not the shooter, but gave the shooter the gun from the backpack. Marcus testified he recognized one of the males — who had a tattoo and sold CDs at the USA Food Mart — from the neighborhood. Marcus identified Harris in the courtroom as the man he recognized. However, Marcus testified that Harris was not the shooter; rather, Harris took the gun out of the backpack that the darker-skinned male was wearing and handed it to the darker-skinned male.

{¶24} Harry, Parker's best friend, testified that he only recognized one of the males — the one known as the "CD guy," who was identified as Harris. Harry described another male as light-skinned with tight braids, and the third as a darker-skinned, heavy-set male with a "little [A]fro" hairstyle. Harry told the jury that Parker kept arguing with the group of males. During that time, he saw Harris take the backpack off his back and put it in front of him and then pass something to the darker-skinned male wearing a striped shirt. According to Harry, once Harris passed the backpack to the

dark-skinned male, Harris and the other male ran away. However, when the scene escalated between Parker and the darker-skinned male, the male started shooting.

{¶25} Chastity testified that the male with the book bag handed something from his pocket to the male with the dreadlocks.

{¶26} Tyler's identification was made solely on the presence of the teardrop tattoo on Harris's face. He testified that he saw the "tattoo guy" pull a gun out from the other male's book bag. He identified Harris in court as the shooter — as "the black guy with the teardrop tattoo." He made this in-court identification even though he had not identified Harris in the two photo arrays he viewed shortly after the murder. On one of the photo arrays, the officer wrote next to the photo that Tyler said: "The teardrop. I'll never forget the teardrop. He's the shooter." Tyler admitted he picked those individuals because they each had a teardrop tattoo on their face. Additionally, Tyler admitted that he and his brothers discussed that the male with the teardrop tattoo was the shooter prior to talking with detectives on a later date.

{¶27} Detective Lynch testified that after the shooting, he received a telephone call from Parker's mother with information about the shooter and the name "Byron." Based on the descriptions, photo array identifications, the surveillance video, and the information he received from Martinez and Parker's mother, Detective Lynch obtained a warrant for Harris's arrest. Harris was subsequently arrested in September 2014 in Texas.

**{¶28}** The jury found Harris guilty of all counts it considered, including the one- and three-year firearm specifications, and the trial court found him guilty of all counts and specifications tried to the bench. Harris was sentenced to life in prison with the possibility of parole after 29 years.

**{¶29}** Harris now appeals, raising five assignments of error, which will be addressed out of order.

## I. Sufficiency of the Evidence — Aggravated Murder

**{¶30}** Harris argues in his second assignment of error that insufficient evidence was presented to support his conviction for aggravated murder. Specifically, he contends that the state failed to present sufficient evidence that the shooter acted with prior calculation and design.

**{¶31}** A Crim.R. 29 motion challenges the sufficiency of the evidence. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Walker*, Slip Opinion

No. 2016-Ohio-8295, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶32}** In the Ohio Supreme Court's recent *Walker* decision, the court discussed the elements of aggravated murder, specifically (1) purpose and (2) prior calculation and design, addressing what each element requires. It stated in its syllabus, "the elements of purpose and prior calculation and design are distinct, and the state must prove both to support a conviction of aggravated murder under R.C. 2903.01." *Id*. at syllabus.

**{¶33}** The Supreme Court reiterated that

[R.C. 2903.01(A) employs] the phrase, "prior calculation and design," to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of "prior calculation and design." In this context, *momentary deliberation is considered insufficient* to constitute a studied scheme to kill.

(Emphasis sic.) *Id*. at ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971). *See also State v. Taylor*, 78 Ohio St.3d 15, 18-19, 676 N.E.2d 82 (1997); *State v. Woods*, 8th Dist. Cuyahoga No. 99630, 2014-Ohio-1722, ¶ 24.

**{¶34}** The *Walker* court succinctly concluded

> [t]he phrase "prior calculation and design" by its own terms suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of premeditated decision or a studied consideration of the method and the means to cause a death.

*Walker*, Slip Opinion No. 2016-Ohio-8295 at ¶ 18.

**{¶35}** The divided *Walker* court differed on whether the facts of the case were sufficient evidence to conclude that Walker acted with the prior calculation and design, with the dissent stressing the importance of viewing the evidence in the light most favorable to the state when reviewing a sufficiency argument.

**{¶36}** The *Walker* majority determined that insufficient evidence was presented to support Walker's aggravated murder conviction. It concluded that witnesses provided testimony to the jury of speculation as to what had happened, but the videos show an assault that quickly escalated into chaos. For approximately 20 seconds of that chaos, Walker was obscured from the security cameras by a pillar. The court reasoned that a jury could reasonably infer that during that time, Walker decided to kill the victim by shooting him, but it could not reasonably infer that he planned the murder beforehand with prior calculation and design, because "[t]he element of prior calculation and design requires evidence that supports more than the inference of purpose, [and] inferring prior calculation and design from an inference of purpose is mere speculation." *Id*. at ¶ 26.

**{¶37}** Therefore, the existence of prior calculation and design is determined on a case-by-case basis analysis of the facts and evidence. *State v. Jones*, 91 Ohio St.3d 335,

345, 744 N.E.2d 1163 (2001). Although there is no bright-line test for determining prior calculation and design, the Ohio Supreme Court has found that several factors, including whether the accused and the victim knew each other, whether there was thought or preparation in choosing the murder weapon or murder site, and whether the act was "drawn out" or "an almost instantaneous eruption of events" should be weighed with the totality of the circumstances surrounding the murder to determine whether there was prior calculation and design. *See Walker* at ¶ 20, quoting *Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976). "Aggravated murder is a purposeful killing that *also* requires proof of prior calculation and design: forethought, planning, choice of weapon, choice of means, and the execution of the plan." (Emphasis sic). *Walker* at ¶ 28.

{¶38} The Ohio Supreme Court has upheld findings of prior calculation and design in short-duration emotional situations. "Pursuing and killing a fleeing or incapacitated victim after an initial confrontation strongly indicates prior calculation and design." *Walker* at ¶ 22, citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 45, citing *State v. Robbins*, 58 Ohio St.2d 74, 78-79, 388 N.E.2d 755 (1979); *see also State v. Palmer*, 80 Ohio St.3d 543, 569-570, 687 N.E.2d 685 (1997) (after victim had fallen to the ground, defendant shot the victim in the head in an execution-style manner). "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), as long as the killer's actions "went beyond a

momentary impulse and show that he was determined to complete a specific course of action." *Conway* at ¶ 46.

**{¶39}** In *Palmer*, the Supreme Court explained that sufficient evidence of prior calculation and design existed when, after being involved in a minor accident with a pickup truck, the defendant exited the vehicle with a loaded revolver that was cocked and ready to fire and shot the truck's driver twice in the head. *Id*. at 543, 568. Although the killing took only moments, the court concluded that "[t]he evidence, when viewed in a light most favorable to the state, was more than sufficient to show that [the defendant] had adopted a plan to kill [the driver] prior to exiting [the] vehicle and that, with a level of precision, [the defendant] followed through on his calculated decision to kill." *Id*. at 569.

**{¶40}** However, at other times, the Supreme Court has declined to uphold findings of "prior calculation and design" in explosive, short-duration situations. *See Walker*, and *State v. Reed*, 65 Ohio St.2d 117, 418 N.E.2d 1359 (1981) (after a botched theft, accused shot a pursuing civilian and police officer); *see also State v. Mulkey*, 98 Ohio App.3d 773, 649 N.E.2d 897 (10th Dist.1994) (street-gang attack on victim); *State v. Davis*, 8 Ohio App.3d 205, 456 N.E.2d 1256 (8th Dist.1982) (excluded patron shot bar owner and doorman).

**{¶41}** In this case, the question remains — was this a sudden eruption of events where Harris acted with momentary deliberation? After considering *Walker*, the cases cited above, the *Taylor* factors, and the evidence in the light most favorable to the

prosecution, we find that sufficient evidence was presented that Harris was the actual shooter and that he acted purposefully and with prior calculation and design.

{¶42} After shooting at Parker and Martinez once to ward off the chase that began a block over, Harris did not leave the scene. Instead, Harris made the calculated decision to come after Parker and continue shooting. Martinez testified that he heard four gun shots — the first one was the bullet that went whistling past his ear. He then saw Harris standing next to a fire hydrant, shooting in Parker's direction that hit Parker's hand, causing him to shout that he had been struck by the bullet. According to Martinez, Parker ran behind the a tree for protection; however, Harris shot at Parker again, hitting him in the arm area. Martinez testified that Harris kept "coming up" on Parker and then shot him again in the chest.

{¶43} Martinez's testimony is consistent with Dr. Felo's testimony that Parker suffered from three gunshot wounds — one to the hand, and two to the chest area. According to Dr. Felo, the exit wound of one of the gunshots was consistent with Parker's back being up against something, like a tree. According to Dr. Felo, this gunshot wound, which pierced Parker's lung causing it to collapse, would not have been immediately fatal and with medical attention, Parker could have survived. The second analyzed gunshot wound was more severe. The bullet pierced through Parker's lungs, heart, diaphragm, and liver. The bullet was recovered from Parker's body. According to Dr. Felo, this gunshot wound was fatal, but Parker would have been able to walk a distance before going into shock and collapsing.

**{¶44}** Applying the *Taylor* factors to this case, there was no testimony that Parker knew Harris or any of the men he was with prior to the day of the murder. However, the testimony revealed that a few of the witnesses, who also lived in the area, knew Harris as the "CD man." Therefore, it is possible that Parker also knew Harris as the "CD man"; however, there was no evidence that Parker and Harris had a strained relationship before the day of the murder. Nevertheless, the events of this particular day unfolded to where any prior relationship or acquaintance status could have become strained due to Parker continuing to follow, taunt, and ultimately chase Harris and his acquaintances. Each of Parker's friends testified that Parker led the charge to follow Harris's group to "talk" to them about what happened on the bus with Tyler. In fact, Tyler testified that Parker was cussing at the group asking if they wanted to "fight." During this time, Harris and his friends retrieved a gun from a backpack that one of them was wearing, and Harris placed the gun in his waistband. The jury could have reasonably inferred that the purpose behind retrieving the gun was to use or brandish it, thus choosing the murder weapon. Accordingly, it also could reasonably be inferred that if any relationship existed, it became strained during the course of the altercation to the point that thought went into retrieving a gun from a concealed location.

**{¶45}** Additionally, a reasonable juror could have concluded that the shooting was not an instantaneous eruption of events. Parker's group followed Harris's group from at least Osceola Avenue to East 123rd Street and ultimately to Phillips Avenue, where the murder occurred. At some point, a gun was retrieved from a backpack, thus calculating

its potential use. When the shooting actually occurred, Harris fired the weapon approximately four times, each time coming closer to Parker despite Parker's attempt to retreat or hide. Even after Parker was shot twice, Harris kept pursuing Parker and shooting. A rational trier of fact could find based on the totality of the circumstances surrounding the murder, that Harris acted with purpose and prior calculation and design when he retrieved the gun from a concealed location, fired the gun repeatedly at Parker, even though Parker had already been shot twice, and was retreating and attempting to hide. Harris kept approaching Parker, firing the weapon, and only after Parker yelled out "I'm hit" and collapsed on the ground did Harris stop shooting and leave the scene.

{¶46} Harris's actions of pursuing Parker, even after Parker was shot twice and seeking cover behind a tree, and then shooting him again, demonstrates Harris's quickly conceived plan to kill Parker. Accordingly, Harris's second assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶47} Harris contends in his third assigned error that "[t]he manifest weight of the evidence did not support a conviction for any offense, including those based on accomplice liability, or for conviction as a principal offender."

{¶48} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598 at ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving

conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997)   A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction."   *Id.*

{¶49} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact.   *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).   The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony."   *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.   The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶50} Harris raises a myriad of issues why his convictions are against the manifest weight of the evidence.   Specifically, he contends that a reasonable jury could not have concluded, beyond a reasonable doubt, that he (1) was the shooter, (2) gave the shooter the gun, (3) shared the animus of the shooter, (4) did not renounce his involvement

altogether, (5) acted with prior calculation and design, (6) was on the scene, or (7) was not acting, either directly or vicariously, in self-defense.

{¶51} Harris contends that the jury's finding that he was the shooter and that he acted with prior calculation and design is against the manifest weight of the evidence. We disagree. As previously discussed under the sufficiency analysis, a reasonable jury could conclude that Harris was the shooter and acted with purpose and prior calculation and design.

{¶52} The identification of Harris as the shooter came from the witnesses who were in the best position to see who fired the weapon. The shooter was right outside Collins's home, and Collins remembered that the shooter was wearing gray jogging pants. Martinez also described the shooter as wearing gray jogging pants. From the video, Detective Lynch concluded that Martinez was in one of the best places to see who the shooter was. Further, Detective Lynch stated that most of the other people who attempted to identify what the shooter was wearing did not round the corner where the shooter would have been visible. Although Marcus and Harry each testified that Harris was not the shooter, it is within the jury's discretion to give more weight to certain testimony over other testimony. In this case, the jury, in its full discretion, gave more weight to the testimony of Martinez, Collins, and Isaac.

{¶53} Additionally, the weight of the evidence supports that Harris acted with purpose and prior calculation and design. During the chase, Harris retrieved the gun from a concealed location and placed it in his waistband. After rounding the corner,

Harris turned and opened fire on Parker with each shot being taken at a closer range. Harris continued shooting even after Parker was shot twice, yelled that he had been hit, and retreated behind a tree. Based on the evidence, the jury could conclude that Parker's back was up against a tree when Harris approached one final time and shot him in the chest. Based on the facts and evidence, we cannot say that the jury lost its way in finding Harris guilty of aggravated murder.

{¶54} If the jury did not believe that Harris was the shooter, but rather an accomplice to the murder, evidence was presented that Harris gave the shooter the gun. The act of providing the murder weapon to the shooter evidences that Harris acted with the same animus as the shooter. *See State v. Davis*, 5th Dist. Richland No. CA-2133, 1983 Ohio App. LEXIS 5767 (1983).

{¶55} Harris next contends that his convictions are against the manifest weight of the evidence because no jury could reasonably believe that he was actually present at the time of the murder. The basis for this argument seems to be that the police supplied the witnesses with the description and identity of the shooter. There is nothing in the record or evidence to support Harris's accusation. Alternatively, he argues that if he was on the scene, his act of running away amounted to renunciation, and the jury lost its way in finding him guilty under a complicity theory. The evidence suggested that Harris either shot Parker or provided the shooter with the gun. Despite Harris's argument that he ran away, constituting renunciation, the case law is clear that a person who provides a firearm to the shooter can be guilty under an aiding and abetting theory. *See, e.g., Davis.*

**{¶56}** We also find unpersuasive that Harris's convictions are against the manifest weight of the evidence because the jury could have reasonably believed that Harris was acting in self-defense. Harris did not argue self-defense, and the jury was not instructed on self-defense. This argument is without merit.

**{¶57}** Accordingly, this is not the exceptional case where the jury clearly lost its way in finding Harris guilty of aggravated murder, murder, felonious assault, or discharging a firearm over a public road. Harris's third assignment of error is overruled.

### III. Jury Instruction

**{¶58}** In *State v. Herring*, 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (2002), the Ohio Supreme Court reiterated, that R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated in terms of the principal offense" and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. *See State v. Keenan*, 81 Ohio St.3d 133, 151, 689 N.E.2d 929 (1998), citing *Hill v. Perini*, 788 F.2d 406, 407-408 (6th Cir.1986).

**{¶59}** An accomplice to the commission of a criminal offense is subject to the same prosecution and punishment as the principal offender, and may be charged in the language of the principal offense. R.C. 2923.03(F). Therefore, one charged with violating a provision of the Ohio Criminal Code is arguably put on fair notice that the

state may proceed against him at trial as either an accomplice or principal, and thus should prepare his defense to respond to either theory of culpability.

{¶60} In his first assignment of error, Harris contends that he was deprived of his right to due process under federal and state law amounting to plain error when the jury was not properly instructed on accomplice liability, thereby affecting the entirety of trial.

{¶61} Harris failed to object to the manner in which the court gave the jury instructions; therefore, plain error must be found to reverse his convictions and for a new trial to be ordered. Crim.R. 30(A). In order to prevail under a plain error analysis, the appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus; Crim.R. 52(B). An erroneous jury instruction does not rise to the level of plain error unless it is clear that absent the error, the jury's verdict would have been different. *State v. Williams*, 8th Dist. Cuyahoga No. 94616, 2011-Ohio-925, ¶ 36, citing *Long*.

{¶62} In this case, the trial court gave the jury the following written instruction on accomplice liability:

Aid and abet.

A person may be an accomplice in an offense and prosecuted as the principal offender if he aids or abets another in committing the offense while acting with the kind of culpability required for the commission of the offense.

A person acting with the kind of culpability required for the commission of a principal offense, who aids or abets another person in the commission of that offense, is an accomplice.

Aided.   "Aid" means to help, assist or strengthen.

Abetted.   "Abet" means to encourage, counsel, incite, or assist.

The State may demonstrate that an accused is guilty of aiding and abetting by direct or circumstantial evidence.

Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed.

An accomplice must perform some act to facilitate the commission of the principal offense.   Any encouragement, assistance, counseling, or command is sufficient.

A person's mere association with a principal offender is not enough to sustain a conviction based upon aiding and abetting.   There must be some level of active participation by way of providing assistance or encouragement.   Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not aiding and abetting of the act.

*See also* tr. 710-711.

{¶63} Subsequently, the trial court instructed the jury regarding aggravated murder as follows, in relevant part,

The defendant, Byron Harris, Jr., is charged in Count 1 of the indictment with aggravated murder, in violation of Revised Code Section 2903.01(A).

Before you can find the defendant guilty of aggravated murder, you must find beyond a reasonable doubt that on or about the 17th day of August, 2014, and in Cuyahoga County, Ohio, the defendant did purposely, and with prior calculation and design, cause the death of James Parker, Jr.

Purposely.   Purpose to cause the death is an essential element of the crime of aggravated murder.   A person acts purposely when it is his specific

intention to cause a certain result. It must be established in this case at the time in question there was present in the mind of the defendant a specific intention to purposely cause the death of James Parker, Jr.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.

How determined. The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.

Inference. Use of deadly weapon. You may infer a purpose to cause the death of another where the natural or probable consequences of the defendant's act is to produce death in light of all the surrounding circumstances. Such circumstances include the weapon used and its capability to destroy life.

If you find that the defendant used a deadly weapon against another in a manner calculated to destroy life, the purpose to cause death may be, but is not required to be, inferred from the use of the weapon. Whether an inference is made rests entirely with you.

Tr. 713-714.

{¶64} Harris contends that the aiding and abetting instruction did not match the Ohio Jury Instructions ("OJI"), did not require the jury to find that he shared the same mens rea as the principal offender, and based on other errors, lowered the state's burden of proof for all convictions.

{¶65} Contrary to Harris's initial argument, a trial court is not required to provide the jury with a verbatim recitation of a requested jury instruction, such as any instruction contained within the OJI. *State v. Kent*, 8th Dist. Cuyahoga No. 90795, 2010-Ohio-1851, ¶ 9, citing *State v. Scott*, 26 Ohio St.3d 92, 497 N.E.2d 55 (1986). The trial court's jury

instruction need only communicate to the jury the legal principles and law pertinent to the case. *Kent* at *id.*, citing *State v. Sneed*, 63 Ohio St.3d 3, 584 N.E.2d 1160 (1992). Therefore, not matching the OJI instruction does not constitute reversible, let alone, plain error.

{¶66} A review of the court's jury instructions reveal that the court mirrored the language of the complicity statute, R.C. 2923.03, when it instructed the jury on aiding and abetting by using the words "kind of culpability," which are found in the statute. Therefore, while the court did not expressly use the words that Harris needed to have the same "criminal intent" as the principal, the instruction as a whole allowed a reasonable juror to concluded that under an accomplice theory, the "kind of culpability" was "purposely, and with prior calculation and design." *See State v. Jalowiec*, 91 Ohio St.3d 220, 231, 744 N.E.2d 163 (2001) (single instruction may not be judged in artificial isolation, but must be viewed in the context of the overall charge).

{¶67} In support of his argument that the court's jury instruction lowered the state's burden of proof, Harris cites *Clark v. Jugo*, 676 F.2d 1099 (6th Cir.1982). In *Clark*, the trial court instructed the jury that

> [p]urpose to cause the death of another is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the Defendant and/or his accomplice a specific intention to cause the death of [the victim].

*Id*. at 1101.

{¶68} The *Clark* court found that the inclusion of this "and/or" language could reasonably have been interpreted by a reasonable juror that the state was relieved of its burden to prove that the defendant had a purpose to kill the victim because the jury was instructed that the essential element of purpose to kill could be found in the mind of the defendant "and/or" his accomplice. *Id*. at 1104. The court concluded that "the charge could easily have been interpreted to mean that Clark, personally, did not have to have purpose to kill, and that Jones' purpose was sufficient to convict Clark, even if not shared by Clark." *Id*. at 1105. The court held that "where purpose to kill is an essential element of the crime of aggravated murder, a jury instruction permitting that element of culpability to be found in either the defendant or his accomplice is violative of the principles of Due Process under the Fourteenth Amendment." *Id*. at 1106.

{¶69} In this case, the trial court instructed the jury that "[a] person may be an accomplice in an offense and prosecuted as the principal offender if he aids or abets another in committing the offense while acting with the kind of culpability required for the commission of the offense." *See also* tr. 710. The trial court again instructed the jury that "[a] person acting with the kind of culpability required for the commission of a principal offense who aids or abets another person in the commission of that offense is an accomplice." Tr. at *id*.

{¶70} When the court defined the principal offense, the trial court properly instructed the jury on the mens rea required to convict on each of the charges. Accordingly, *Clark* is clearly distinguishable, and the jury in this case was properly

instructed on culpability when the accomplice instruction was given. Moreover, the jury could have believed that the Harris was the actual shooter; thus, making any deviation on the complicity instruction harmless.

{¶71} Accordingly, Harris's first assignment of error is overruled.

## IV. Effective Assistance of Counsel

{¶72} Harris raises in his fourth assignment of error that his defense counsel provided constitutionally ineffective assistance at "trial by failing to properly define 'accomplice liability,' provide the affirmative defense for the jury contained therein, or object to the state's inflammatory remarks on closing."

{¶73} To establish ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonable representation, and (2) that he was prejudiced by that performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶74} The failure to prove either prong of the *Strickland* two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland* at 697. "In particular, a court need not determine whether counsel's performance was deficient before examining the

prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at *id.*

{¶75} Harris first contends that his counsel was ineffective for allowing an erroneous jury instruction on accomplice liability. Having previously concluded that the accomplice instruction given by the court properly instructed the jury on the requisite culpability, counsel was not ineffective for failing to challenge or object to the accomplice liability jury instruction.

{¶76} Harris also contends his counsel was ineffective for failing to request an instruction on the affirmative defense of renunciation. An affirmative defense to complicity occurs when prior to the commission of the offense, the actor ends his complicity by manifesting a complete and voluntary renunciation of his criminal purpose. R.C. 2923.03(E). To prove termination, Harris would have to show that he manifested a complete and voluntary renunciation of his criminal purpose.

{¶77} Harris supports his argument with the evidence that suggested that he ran from the scene before the shooting occurred. He contends that this flight constituted renunciation of whatever intent or purpose the shooter had. While there was evidence suggesting Harris fled the scene, the jury also heard evidence suggesting that Harris was the actual shooter. Reconciling the competing or conflicting evidence was for the jury.

{¶78} Furthermore, the evidence did not support an instruction on renunciation. The state primarily argued that Harris was the shooter, and thus the principal offender.

However, if the jury did not believe that Harris was the shooter, evidence was presented that Harris handed the firearm to the shooter prior to the shooting, thus demonstrating that he was an accomplice to the shooting. Evidence that an accomplice flees from a crime scene after supplying the principal offender with the murder weapon is insufficient to warrant an instruction on renunciation. *Davis*, 5th Dist. Richland No. CA-2133, 1983 Ohio App. LEXIS 5767 (renunciation must be complete and voluntary; not flight to avoid apprehension for a crime already committed). Accordingly, counsel was not ineffective when he did not request a renunciation instruction.

{¶79} As will be discussed in addressing Harris's fifth assignment of error, counsel was not ineffective for failing to object to the prosecutor's comments during closing argument because the prosecutor's comments did not constitute misconduct.

{¶80} Having found no deficient performance by counsel, Harris's fourth assignment of error is overruled.

## V. Prosecutorial Misconduct

{¶81} In his fifth assignment of error, Harris contends that the prosecutor committed prosecutorial misconduct by comparing his personal experiences to the evidence at trial during closing arguments.

{¶82} Closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial. *State v. Mann*, 93 Ohio App.3d 301, 312, 638 N.E.2d 585 (8th Dist.1993). An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks

substantially prejudiced appellant. *State v. Pate*, 8th Dist. Cuyahoga No. 95382, 2011-Ohio-1692, ¶ 19, citing *State v. Smith*, 14 Ohio St.3d 13, 470 N.E.2d 883 (1984).

**{¶83}** We note at the outset that defense counsel did not object to these statements and, in turn, has waived the issue on appeal except for plain error. *Pate*, citing *State v. Owens*, 51 Ohio App.2d 132, 146, 366 N.E.2d 1367 (9th Dist.1975). As previously discussed, notice of plain error is to be taken with the utmost caution, to prevent a manifest miscarriage of justice, and should be found when, but for the error, the outcome of the trial would have been different. *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804.

**{¶84}** In general, a prosecutor has considerable latitude in his closing argument. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). "The state is largely free to comment on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). The test for prosecutorial misconduct during closing argument is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused. *State v. White*, 82 Ohio St.3d 16, 22, 693 N.E.2d 772 (1998). For this determination, an appellate court should consider the nature of the remarks, whether an objection was made by counsel, whether corrective instructions were given by the court, and the strength of the evidence against the defendant. *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995). Additionally, "isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."

*State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

**{¶85}** In this case, the complained-of, isolated comments made by the prosecutor during closing arguments were made in rebuttal after defense counsel argued that the state's witnesses provided inconsistent and conflicting testimony. The prosecutor merely commented on the defense's assertion that the state was hiding from the inconsistencies. Furthermore, immediately after discussing the existence of inconsistencies in the testimonies, the prosecutor reminded the jury that "[y]our job is to sift through it. Look at the consistencies. Look at the opportunities for consistencies, like the people who are consistent about actions, to see the actions. Look at the inconsistencies. Look at the video — where these come from." (Tr. 701.)

**{¶86}** Moreover, upon a review of the entire closing argument by the state and the defense, we find that defense counsel also interjected his opinions on what he believed the evidence showed or did not show. Even after the state objected and a side-bar was held, defense counsel continued with his beliefs. Therefore, if the state commented on what it believed the evidence showed, it was only in response to what defense counsel repeatedly stated. Accordingly, it could be argued that any error Harris now argues about on appeal could be deemed invited error.

**{¶87}** Nevertheless, we find that the prosecutor's isolated comment was not prejudicial and did not amount to plain error. Furthermore, the trial court, immediately

after the state ended its closing argument, instructed the jury that closing arguments are not evidence. It is presumed that the jury followed this instruction.

{¶88} Accordingly, the prosecutor did not engage in misconduct during his closing argument because the remarks did not rise to the level of misconduct that would substantively deprive Harris of a fair trial. Having found that the prosecutor's comments did not constitute misconduct, Harris's defense counsel was, therefore, not ineffective for failing to object to them. The fifth assignment of error is overruled.

{¶89} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR