[Cite as *State v. Finklea*, 2026-Ohio-1762.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,      :

                                No. 113566

    v.                       :

ROGER FINKLEA,                    :

    Defendant-Appellant.     :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED IN PART, AFFIRMED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** May 14, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-677575-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian Callahan, Assistant Prosecuting Attorneys, *for appellee*

Law Office of Timothy Farrell Sweeney and Timothy F. Sweeney, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} This appeal is before us after this court granted defendant-appellant Roger Finklea's motion to reopen his appeal pursuant to App.R. 26(B). *See State v. Finklea*, 2025-Ohio-926 (8th Dist.). After a close review of the record and applicable

law, we vacate appellant's conviction for aggravated murder pursuant to R.C. 2903.01(A) (prior calculation and design) and affirm his other convictions.

**Procedural History**

{¶ 2} Appellant was charged with (1) aggravated murder pursuant to R.C. 2903.01(A) — prior calculation and design; (2) aggravated murder pursuant to R.C. 2903.01(B) — purposely causing a death while committing aggravated burglary; (3) murder pursuant to R.C. 2903.02(B) — causing a death while committing a felony offense of the first or second degree; (4) felonious assault pursuant to R.C. 2903.11(A)(1) — knowingly causing serious physical harm; (5) felonious assault pursuant to R.C. 2903.11(A)(2) — causing physical harm by means of a firearm; (6) aggravated burglary pursuant to R.C. 2911.11(A)(2); and (7) having weapons while under disability pursuant to R.C. 2923.13(A)(3). The first six charges were accompanied by one- and three-year firearm specifications.

{¶ 3} The matter proceeded to a jury trial on the first six counts. Appellant executed a jury waiver on the charge of having weapons while under disability. On the second day of trial, one of the jurors reported to the court that he had heard another juror say that she had already made up her mind about the case. The trial court conducted a full inquiry into the matter and concluded that all the jurors could be impartial.

{¶ 4} The jury convicted appellant of the first six charges, and the trial court convicted him of having weapons while under disability. The trial court merged the three murder counts and the two felonious-assault charges, and the State elected to

sentence on Count 1, prior calculation and design. The judge imposed a 25-year to life sentence on that count consecutive to two three-year firearm specifications. The court imposed an eight-to-12-year sentence for aggravated burglary and a 30-month sentence for having a weapon while under disability and ordered that they run concurrently to each other and to the aggravated murder sentence for a total sentence of 31 years to life.

{¶ 5} Appellant appealed. On appeal, appellant argued that the trial court abused its discretion and committed prejudicial error by denying his motion for a mistrial and by failing to remove the juror who had prematurely expressed an opinion about appellant's guilt to other jurors. *State v. Finklea*, 2024-Ohio-5096 (8th Dist.). This court overruled appellant's assignment of error and affirmed his convictions.

{¶ 6} Appellant filed an App.R. 26(B) motion to reopen his appeal in which he argued that his appellate counsel should have argued the following: (1) the verdicts were against the manifest weight of the evidence, especially, the conviction for aggravated murder under R.C. 2903.01(A), prior calculation and design; (2) the verdicts were not supported by sufficient evidence; and (3) the indictment was faulty and defective. *Finklea*, 2025-Ohio-926, at ¶ 1 (8th Dist.).

{¶ 7} This court determined that appellant raised a genuine issue as to whether he was deprived of the effective assistance of appellate counsel for only arguing the juror issue and not arguing the propriety of the aggravated-murder and aggravated-burglary convictions, granted appellant's motion, and reopened the

appeal. *Id.* at ¶ 12. However, in doing so this court found that there was no merit to appellant's proposed third assignment of error regarding the indictment. *Id.* at fn. 1.

{¶ 8} Appellant now raises four assignments of error, arguing that he received ineffective assistance of appellate counsel because counsel should have presented the following arguments: (1) appellant's convictions for aggravated murder and aggravated burglary were not supported by sufficient evidence; (2) appellant's convictions were against the manifest weight of the evidence; (3) the trial court committed plain error by allowing in evidence of gang involvement; and (4) appellant deserves a new trial because of ineffective assistance of trial counsel.

**Jury Trial**

{¶ 9} The following pertinent evidence was presented at appellant's trial.

**Biesha Williams's Testimony**

{¶ 10} On or about April 30, 2022, Biesha Williams ("Williams") returned to her apartment in the early morning hours after a night out with her on-again, off-again boyfriend Raymell Terrell ("Raymell"); Raymell went into the apartment with Williams. Williams lived in apartment four, which was on the second floor of a two-story apartment building that contained four apartments. The events that transpired took place in the kitchen and living room of the small apartment and outside the apartment on the small landing and stairs leading down to the first floor of the building.

{¶ 11} Shortly after Williams and Raymell arrived back to the apartment Williams's close friend Lee Jordan ("Jordan"), whom she referred to as her brother,

came over. Raymell and Jordan began to argue and fight after Raymell started berating Williams; Williams also got involved in the fight, hitting Raymell at least once. Jordan was armed but never brandished his weapon.

{¶ 12} Williams then told Raymell to leave and threw his clothes out in the hallway, where they landed on the landing in between the first and second floors of the apartment building. Raymell refused to leave. Instead, he called his mother for a ride and she, in turn, called his brother, Leon Terrell ("Leon").[1] According to Williams, she did not know Leon was coming to the apartment to get Raymell.

{¶ 13} Williams and Jordan were in the apartment's kitchen and Raymell was in the living room when Leon, appellant, and another man, Frederick Judge ("Judge"), entered the apartment through the front door. To access the apartment, the men had to enter the apartment building through the side entrance and go up a short flight of stairs to the first floor where apartments one and two were located, up another flight of stairs to the landing between the first and second floors, and then up another short flight of stairs to access Williams's apartment on the second floor. Williams testified that Jordan had locked the door after a quick trip to his car and theorized that Raymell must have unlocked it to let the men in.

{¶ 14} Surveillance video, which was entered into evidence and shown to the jury, showed a white Jeep Cherokee pulling into the driveway of the apartment building and three men exiting the car; the three men, later identified as appellant,

---

[1] Witnesses testified that Williams and Raymell argued frequently. When this happened, Raymell would call his mother or one of his brothers for a ride.

Leon, and Judge, entered the building through an unlocked side door. Leon entered the apartment building first, followed by appellant, and then Judge.

{¶ 15} Williams testified that two of the three men were armed when they entered her apartment. Williams did not know the men were coming, did not invite them into her apartment, and initially thought they were going to kill her. She testified that Leon, whom she knew, was the first to enter the apartment and he had a gun on his hip. Williams thought she recognized the second man as the best friend of another Terrell brother, Randy Terrell ("Randy"). Williams described the second man as short, dark, with a "low haircut," and said he was unarmed. Williams did not know the third man, nor did she get a good look at him, except to see that he was carrying a gun in his right hand. Williams stated that the third man "was trying to shut us all inside" and was about to shut the door when Jordan pushed past the three men and ran out of the apartment. (Tr. 579.) After the men entered, the third man blocked the door exiting the apartment, but Jordan was able to brush or push past him and hurried out of the apartment. Jordan made it down to the first floor of the building when he was shot in the back of the head, causing his death.

{¶ 16} Initially, Williams told police that the third man was Randy. She did not recognize appellant in the courtroom as the second man who came through the door and never identified appellant as the third man who came through the door; she did not recognize appellant as being one of the men in her apartment that night.

{¶ 17} There was conflicting testimony about who was where when the shot was fired. According to Williams, as soon as Jordan fled the apartment, the third

man, who was armed, ran out followed by Leon. Williams testified that the third man was on the third or fourth step down from her apartment and the man who had entered her apartment second was in front of the third man, further down the steps. At this point both Leon and the unknown third man were pointing their guns at Jordan. Williams heard one gunshot and then went back inside her apartment and hid in a closet. She did not see who fired the one shot. After a short time, Williams went out to see what happened and found Jordan on the landing. She called 9-1-1.

{¶ 18} As mentioned, Williams told police that Randy was at the apartment and confirmed this by choosing him out of a lineup. Williams later realized, however, that it was not Randy.

{¶ 19} Witness testimony and surveillance video established that the men exited the apartment building in the following order: appellant, Judge, Leon, and Raymell. The men got into the Jeep and sped off. The entire sequence of events, from the men getting out of the Jeep and entering the building, going up three flights of stairs and entering Williams's apartment; Jordan leaving the apartment and being shot; and the men fleeing (now including Raymell), was less than one minute.

**Coroner's Testimony**

{¶ 20} According to the coroner, Jordan died from a single gunshot wound to the back of his head. The bullet entered the center back of his head, traveling from right to left about an inch, downward, and six inches into his skull. The coroner could not tell where the shooter was located when Jordan was shot, except that the shooter must have been standing more than two feet away, shooting downward. The coroner testified that there was no evidence that Jordan traveled any distance from where he was shot to where he was found at the bottom of the steps on the landing directly outside of apartment two and that he would have "dropped" immediately after he was shot.

**Police Investigation**

{¶ 21} Police arrived to find Williams bending over Jordan's lifeless body; she was inconsolable. Police processed the scene and recovered a spent Browning 9 mm Luger cartridge casing on the landing between the first and second floors of the apartment building. No casings were located on the small landing outside Williams's apartment door. Officers also recovered two cell phones, one in Jordan's pocket and one near his body. Officers collected blood and potential touch DNA samples from various locations on scene. Appellant's DNA was recovered from the interior front doorknob of Williams's apartment. No weapons were recovered. The police subpoenaed appellant's phone records, which placed him at or near the scene of the shooting when the shooting occurred. Police recovered surveillance video that

showed the apartment building and area surveillance video that showed the white Jeep approaching and leaving the area.

{¶ 22} Police determined that the gun used in the shooting was a 9 mm caliber firearm. A few months later, the police received a tip from Leon and Raymell's attorney that appellant was the shooter and that the murder weapon was buried in his backyard. The police secured a warrant to search appellant's backyard and recovered a single 9 mm Luger Cartridge shell casing, which was tested and found to have been fired from the same weapon that was used to shoot Jordan. Again, the murder weapon itself was never recovered.

**Alyscia Henkel's Testimony**

{¶ 23} Alyscia Henkel ("Alyscia") testified that she was driving around in her Jeep partying with her friend, Krystina Muzic. At some point, they met up with Leon, whom she was dating, appellant, and Judge. Alyscia testified she was doing cocaine and drinking alcohol and was "pretty intoxicated." (Tr. 814.)

{¶ 24} They were in the Jeep when Leon received a phone call, prompting him to ask Alyscia if they could get his brother from Williams's apartment. Leon did not seem upset. On the drive over to the apartment they were all "having fun. The music was on." (Tr. 806.) Alyscia could not recall anyone having a conversation on the way over. When they arrived at the apartment, Leon pulled into the driveway and parked the car. His demeanor was "calm" and he reiterated to Alyscia that he was "going to get my brother." (Tr. 807.) She testified all three men got out of the

car and returned a short time later with a fourth man (Raymell). Once the men returned to the car, they were quiet; "there was really no discussion." (Tr. 814.)

{¶ 25} After the shooting, Alyscia and Leon holed up in a hotel for three to four days until Leon fled the state. Alyscia was showed multiple lineups and identified appellant and Judge as being in her car that evening. Alyscia was charged in connection to the shooting and pled guilty to attempted obstruction of justice for lying to the police about Leon's whereabouts after the shooting.

**Krystina Muzic's Testimony**

{¶ 26} Krystina Muzic ("Krystina") testified that she was a passenger in the Jeep on the night of the shooting. At some point she and Alyscia met up with Leon, whom Alyscia was dating, and two men she did not know. Krystina gave an in-court identification of appellant, whom she had described to police as "bald," "bigger," and "older, but not yet 50." (Tr. 648-649.)

{¶ 27} Krystina did not remember much about that evening because she was drinking heavily, but remembered that, on the way to the apartment, the group was having a "fun time," the mood was light, and she did not "see anything off about the situation." (Tr. 639.) However, when the men returned to the car, they acted "a lot more quiet." (Tr. 640.) She did not recall the men having any conversations after they returned to the car and did not learn about the shooting until later that day from a friend.

**Anthony Body's Testimony**

{¶ 28} A few hours after the shooting, Anthony Body ("Anthony"), cousin to the Terrell brothers, met up with Raymell, Leon, appellant, and others to discuss the shooting. Anthony testified that Jordan was one of his friends; he knew him through the Terrell brothers. According to Anthony, appellant admitted to shooting Jordan.

**Raymell's Testimony**

{¶ 29} Raymell testified that he was dating Williams and was at her apartment on the night of shooting. According to Raymell, Williams was "flipping out" and began to hit him so he called his mother for a ride. (Tr. 865.) Contradicting Williams's testimony, Raymell stated that Williams knew that his brother was getting him.

{¶ 30} Leon walked into the apartment with appellant, whom he knew, and Judge, whom he did not know. According to Raymell, appellant and Judge did not look the same. Judge was "slim," "like a skinny dude." (Tr. 901.) Raymell testified that the men entered the apartment calmly. According to Raymell, appellant asked him what had happened to his face. Raymell acknowledged that he had only met appellant a couple of times, and he could not explain why appellant would care about Raymell's face.

{¶ 31} Raymell testified that Jordan ran out of the apartment followed by appellant. Raymell did not see that anyone was armed, except that he knew that Jordan had a gun on his hip. Raymell was standing at the threshold between the kitchen and living room and could see that appellant was on the landing right

outside the apartment door when the shot was fired.[2]   Although he did not see the actual shooting or who the shooter was, Raymell did see appellant tuck something in his waistband right after the shot was fired.  Raymell conceded that he did not have a full view of appellant from his vantage point inside the apartment and did not see what appellant tucked into his waistband.  From his vantage point, Raymell could not see the railing or the stairs going down from Williams's apartment.  He testified he knew it was appellant who fired the shot because appellant and Jordan were the only ones who had left the apartment.

{¶ 32} Contrary to Alyscia's and Krystina's testimonies, Raymell testified that an argument ensued after the men got back to the Jeep.  He asked appellant why he shot Jordan.  Appellant replied, "look at your face," presumably referencing the injuries Raymell sustained during his fight with Williams.  (Tr. 897.)  Appellant told Raymell he had to shoot Jordan because Jordan had a gun.

{¶ 33} Shortly after the shooting, Raymell fled Ohio with one of his cousins, testifying he was scared of retaliation by Jordan's friends, who were members of the notorious street gang the Heartless Felons.

{¶ 34} Raymell was charged with aggravated murder, murder, felonious assault, and aggravated burglary.  Raymell testified he pled guilty to a third-degree felony, obstruction of justice, in exchange for his testimony against appellant.  Raymell was sentenced to community-control sanctions after appellant's trial.

---

[2] Williams testified that Raymell was on the landing outside her apartment when the shot was fired.

**Leon's Testimony**

{¶ 35} Leon testified that he was with appellant and Judge on the night of the shooting. They were drinking heavily, smoking marijuana, and ingesting cocaine. Alyscia and Krystina were also with them. Leon received a call from his mother to get Raymell from Williams's apartment. Leon took Raymell from Williams's apartment several times in the past because the couple argued frequently. Leon drove Alyscia's Jeep to the apartment. Alyscia sat in the front seat and appellant, Krystina, and Judge sat in the backseat.

{¶ 36} Leon testified he was not armed and never saw appellant or Judge with a gun. Leon testified that he was the first one to enter the apartment, followed by appellant and then Judge. When they entered the apartment, Leon saw Jordan whom he did not know and did not recognize, in the kitchen. Jordan was on his phone, texting. Williams and Raymell were further back in the apartment, in the living room sitting on the couch. Leon walked toward the living room, at which point, Raymell jumped up and, pointing to Jordan, said "this punk ass n**." (Tr. 1100.) Leon took this to mean that Raymell and Jordan "had problems or something." (Tr. 1101.) Raymell appeared to have been crying, he was "puffy-eyed" with a red face, but he did not appear to have been in a fight. *Id.* Leon claimed that as Raymell approached him, Leon used his body to block Raymell from going into the kitchen. Raymell and Jordan "exchanged words," and Jordan "hurried" out of the apartment.

{¶ 37} Contrary to Raymell's testimony that appellant was on the landing outside of the door of apartment 4 when the shot was fired, Leon testified that appellant was on the stairs, near the top column. Judge was below appellant on the stairs. Leon did not see who shot Jordan, but appellant was leaning over the stair railing when the shot was fired, and Leon saw appellant put something in his pocket after the shot was fired. Leon did not see what it was that appellant put in his pocket. Leon asked appellant what happened, and appellant said he shot Jordan because the "[d]ude pulled a gun on me." (Tr. 1117.) Leon said an argument ensued between the men on the ride home.

{¶ 38} Leon testified that Jordan was a member of the Heartless Felons. Another Terrell brother, Anthony Stewart, who was not with them the night of the shooting, was shot at later that day, reportedly in retaliation for Jordan's death. Scared he would be the next victim, Leon fled the state.

{¶ 39} Leon was charged with aggravated murder, murder, felonious assault, and aggravated burglary. Leon pleaded guilty to involuntary manslaughter, burglary, and obstruction of justice in exchange for his testimony at appellant's trial. After appellant's trial, he was sentenced to community-control sanctions.

**Appellant's Police Interview**

{¶ 40} Cleveland Police Detective Andre Hayduk ("Det. Hayduk") interviewed appellant on January 10, 2023. The interview was video recorded and a copy of it was entered into evidence. Appellant initially claimed he was not at Williams's apartment that night but admitted to it after the detective confronted him

with the surveillance video. According to appellant, he had never been to Williams's apartment before and did not know Williams or Jordan. Appellant told Det. Hayduk that both Jordan and Leon were carrying firearms with extenders, as was a third man, named "Solo," who was in the apartment when they arrived. Appellant described Leon as urging Raymell to leave; appellant claimed he likewise pleaded with Raymell to leave.

{¶ 41} Appellant told the detective there was a confrontation between Leon and Jordan. Leon and Jordan "tussled" and went out the apartment door. Appellant said that he and Judge were still in the apartment when he heard a single gunshot. Appellant claimed that they all then ran out of the building and went back to the Jeep where Raymell stated that the "m**fu** deserved everything." Appellant told the detective he did not have a gun on him that evening and did not shoot anyone; it was Leon who "pulled the trigger," killing Jordan. He claimed that Leon had to shoot Jordan because, otherwise, Jordan and "his homeboy" (referring to Solo) were going to kill everyone in the apartment.

**Det. Hayduk's Testimony**

{¶ 42} Det. Hayduk testified as to his investigation into Jordan's death. Det. Hayduk was able to develop a suspect list through witness interviews. Initially, Det. Hayduk thought the other two Terrell brothers, Randy Terrell and Anthony Stewart, were involved, in part, because Williams identified Randy in a lineup. Eventually, the detective ruled out those two brothers as suspects. The detective then developed Judge and appellant as suspects.

{¶ 43} The detective interviewed Judge, who confirmed he was on scene that evening. Judge told the detective that appellant shot Jordan. Despite a material witness warrant, Judge did not show up to trial and efforts to find him so he could testify were unsuccessful.[3]

{¶ 44} In September 2022, Hayduk executed a search warrant at appellant's residence and recovered a spent 9 mm Luger cartridge casing from appellant's backyard. Although no firearm was located at the property, Det. Hayduk testified that the casing was consistent in caliber with the one found at the scene of the shooting. Det. Hayduk interviewed Leon and Raymell in December 2022, after they were arrested in Texas and extradited to Cleveland. Both men identified appellant as the shooter.

**Assignments of Error**

> I. Finklea's convictions on both counts of aggravated murder and aggravated burglary are not supported by constitutionally sufficient evidence of his guilt on all required elements necessary to convict. His convictions on these three counts violate due process; he must be discharged on these counts . . . . Finklea's original appellate counsel was prejudicially ineffective in failing to present this [e]rror.
>
> II. Finklea's convictions on all counts presented to the jury are against the manifest weight of the evidence. He should at least be granted a new trial. Finklea's original appellate counsel was prejudicially ineffective in failing to present this [e]rror.
>
> III. The trial court committed plain error, and denied Finklea a fair trial, when it allowed the admission of irrelevant, inadmissible, and prejudicial hearsay evidence of alleged gang involvement in Jordan's murder and of the Terrell brothers' alleged fear of gang retaliation as

---

[3] The State attempted to charge Judge with aggravated murder in connection with this case, but the grand jury declined to return an indictment.

supposedly necessitating their flight. Finklea's original appellate counsel was prejudicially ineffective in failing to present this [e]rror.

IV. Finklea's trial counsel rendered prejudicially deficient performance in failing to object to the admission of irrelevant, inadmissible, and prejudicial hearsay evidence of alleged gang involvement in Jordan's murder and of the Terrell brothers' alleged fear of gang retaliation as supposedly necessitating their flight. Finklea's original appellate counsel was prejudicially ineffective in failing to present this [e]rror.

**Ineffective Assistance of Counsel**

{¶ 45} Throughout his appeal, appellant argues that he received ineffective assistance of both trial and appellate counsel.

{¶ 46} In a reopened appeal, the appellant bears the burden of showing that "'prejudicial errors were made in the trial court and that ineffective assistance of appellate counsel in the prior appellate proceedings prevented these errors from being presented effectively to the court of appeals.'" *State v. Clark*, 2025-Ohio-4410, ¶ 12, quoting S*tate v. Leyh*, 2022-Ohio-292, ¶ 22, quoting 1993 Staff Notes to App.R. 26(B).

{¶ 47} To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's conduct was deficient, and (2) counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *State v. Lloyd*, 2022-Ohio-4259, ¶ 15. Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland* at 687; *Lloyd* at ¶ 16. The second prong requires a showing that the errors were serious enough to create a reasonable probability that but for the errors, the outcome of the case would have been different. *Strickland* at 694; *Lloyd* at ¶ 18. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 48} When an application to reopen is granted, we will not disturb our prior judgment unless an appellant establishes that the direct appeal was meritorious and failed because appellate counsel rendered ineffective assistance under the two-pronged *Strickland* standard. *Clark* at ¶ 18-19; *see also* App.R. 26(B)(7) and (9).

**Sufficiency of the Evidence**

{¶ 49} In his first assignment of error, appellant argues that there was insufficient evidence to convict him of aggravated murder and aggravated burglary.

{¶ 50} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The relevant inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 51} When making a sufficiency determination, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 386.

**Insufficient Evidence of Aggravated Murder — Prior Calculation and Design**

{¶ 52} Appellant was convicted of two counts of aggravated murder. For Count 1, pursuant to R.C. 2903.01(A), the State had to show that appellant "purposely, and with prior calculation and design, cause[d] the death of another or the unlawful termination of another's pregnancy." Without conceding his overall claim of innocence, appellant argues that the State did not show sufficient evidence that he committed murder with prior calculation and design.

{¶ 53} Generally, to prove prior calculation and design, the State must show that the "defendant had the time and opportunity to plan a homicide and the homicide's circumstances 'show a scheme designed to implement the calculated decision to kill.'" *State v. Maxwell*, 2014-Ohio-1019, ¶ 148, quoting *State v. Cotton,* 56 Ohio St.2d 8 (1978), paragraph three of the syllabus. The "time and opportunity requirement" is not literal and does not need to be necessarily long. All that is required is that the evidence at trial shows "presence of sufficient time and opportunity for the planning of an act of homicide . . . ." *Cotton* at paragraph three of the syllabus. Prior calculation and design is "generally understood to encompass the calculated decision to kill." *State v. Jackson*, 2000 Ohio App. LEXIS 133, *6 (8th Dist. Jan. 20, 2000), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979). "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill." *State v. Coley*, 93 Ohio St.3d 253, 264 (2001). But "[e]vidence of an act committed on the spur of the moment or after momentary

consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 2016-Ohio-8295, ¶ 18. Thus, if the evidence presented by the State is that the homicide was a spontaneous eruption of events, prior calculation and design cannot be shown.

{¶ 54} As we noted in granting appellant's motion to reopen his appeal:

> [R.C. 2903.01(A) employs] the phrase, "prior calculation and design," to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of "prior calculation and design." In this context, *momentary deliberation is considered insufficient* to constitute a studied scheme to kill.

(Emphasis sic.). *Finklea*, 2025-Ohio-926, at ¶ 10 (8th Dist.), quoting *Walker* at ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971).

{¶ 55} "There is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill — each case turns on its own facts." *Walker* at ¶ 19. Nonetheless, the Ohio Supreme Court has identified three nonexclusive factors, which serve as "pertinent considerations" for determining whether there was sufficient evidence of prior calculation and design. *Id.* These factors are:

> (1) Did the accused and victim know each other, and if so, was that relationship strained?

> (2) Did the accused give thought or preparation to choosing the murder weapon or murder site?

(3) Was the act drawn out or "an almost instantaneous eruption of events"?

*State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976).

{¶ 56} Here, we find that the State presented insufficient evidence that appellant acted with prior calculation and design in causing Jordan's death. The evidence shows that during the early morning hours of April 30, 2022, the appellant, Leon, and Judge entered Williams's apartment after Leon was summoned to get Raymell. Both Alyscia and Krystina testified that the mood was light on the drive to the apartment and they were all having fun. Alyscia testified that when Leon asked if they could go get his brother, he was calm and did not seem upset.

{¶ 57} Surveillance video shows the Jeep pulling into the drive of the apartment building at 4:36:54 a.m. The three men walk into the building's unlocked side door at 4:37:10 a.m. and are seen exiting the building less than a minute later at 4:37:55 a.m., now joined by Raymell. The vehicle pulled away at 4:38:32 a.m., less than two minutes from when it had originally pulled into the driveway. The entire sequence of events, from the men walking into the apartment building, climbing multiple flights of stairs, entering the apartment, Jordan being shot, and the men exiting the building, was less than a minute.

{¶ 58} There was no evidence that appellant and Jordan knew each other. There was no evidence that appellant, Leon, and Judge devised a scheme to shoot Jordan and then carried it out. What the evidence did show is that Leon planned to

get his brother and when the men got to the apartment Jordan fled and then was shot.

{¶ 59} The trip was prompted by Raymell's call to his mother, who in turn called Leon to get Raymell at Williams's place, something Leon had done in the past when Raymell and Williams argued. That appellant ended up being along for the ride appears to be happenstance, much like it was for Judge and the two women: they all just happened to be partying with Leon. Leon testified that they were in the "middle of partying" at his dad's house when his mom called and they were planning to go get more drugs after getting Raymell; thus, Leon agreed with his mom's request to "go get [Raymell], because it's in like the same area" as where he would purchase the drugs. (Tr. 1093 and 1128.)

{¶ 60} There was no evidence presented that there was even a suggestion during the drive over to Williams's apartment that anyone was planning on killing Jordan. There was no evidence that anyone in the Jeep was even aware that Jordan was at the apartment. Leon testified that he did not ask Judge and appellant to accompany him from the Jeep up to get Raymell; Leon said they did that on their own, another chance occurrence that resulted in appellant being in the apartment building when Jordan was shot.

{¶ 61} If we assume that the evidence allowed for the inference that appellant was the shooter, the evidence presented at trial does not support the conclusion that appellant acted with advance planning. The facts, construed in the State's favor, show that the shooter reacted in the spur of the moment with, at most, a momentary

consideration that occurred in the seconds after Jordan made the abrupt decision to leave the apartment. Although the dissent insists that we ignored or improperly weighed evidence, it is the dissent that advances a theory that was not advanced by appellant. The dissent hypothesizes that appellant formulated a plan to execute Jordan before entering the apartment, but the State never advanced that theory to the jury. The dissent notes the men's ages at the time of the shooting but their ages are of no consequence unless one is to presume how "grown men" in the same situation would act.

{¶ 62} The State never argued that the evidence inferred a plan to kill Jordan, or anyone else, prior to the three men arriving at the apartment building. At trial, the State's theory was that appellant developed the plan to shoot Jordan while he was running out of the apartment. On appeal, the State theorized that appellant formulated his plan after he entered the apartment, while Raymell was speaking with Leon.

{¶ 63} Although it is generous to assist the State with a different theory that would support prior calculation and design, we are troubled that it is being advanced for the first time by the dissent. As this court has stated, the "party-presentation principle reflects the view that courts function as neutral arbiters and, therefore, should not act as advocates for either party or for any particular result." *State v. McFarland*, 2025-Ohio-5850, ¶ 21 (8th Dist.), citing *United States v. Samuels*, 808 F.2d 1298, 1299 (8th Cir. 1987) (Arnold, J., concurring) (Courts "have enough work to do without assuming an activist role and becoming advocates.").

{¶ 64} The trial witnesses who were present in the apartment at the time of the shooting (Williams, Leon, and Raymell) described the shooting in terms of a sudden eruption of events, completely unexpected and unanticipated. There was no testimony that anyone made any threatening gestures with a weapon after the three men arrived and before Jordan left the apartment or that appellant made any threats to or took any aggressive action toward Jordan after their arrival. Even if there was evidence that there was a confrontation between appellant and Jordan when appellant walked into the apartment, it happened in the spur of the moment.

{¶ 65} The only evidence of any aggression toward Jordan in the apartment in those brief moments after the three men arrived was Raymell's words, as testified to by Leon, that Jordan was supposedly a "punk ass n**." (Tr. 1100.) Even so, Leon testified that he blocked Raymell from getting close to Jordan, thereby avoiding any further interaction with Jordan other than those words. He also testified that appellant himself told Raymell something to the effect of calm down, the antithesis of a confrontation. The dissent's theory supporting prior calculation and design, which was never advanced by the State, is that appellant formulated a plan to kill Jordan, but both Raymell and Leon testified regarding their surprise and anger after the four men returned to the car, evidencing that it was not a planned homicide.

{¶ 66} Contrary to the dissent's opinion, Williams never identified appellant as the third man through the door, nor did she identify him as one of the men who was armed; she could not identify him at all. Even if we assume that appellant had a firearm on him when he entered the apartment, this fact alone does not indicate a

calculated scheme to kill Jordan. Mere possession of a weapon is not, without more, evidence of prior calculation and design for the purposes of aggravated murder. *State v. Hill*, 2013-Ohio-578, ¶ 23 (8th Dist.), citing *State v. Davis*, 8 Ohio App.3d 205 (8th Dist. 1982).

{¶ 67} The State notes that Ohio courts have held that the pursuit and killing of a fleeing or incapacitated victim after an initial confrontation strongly indicates prior calculation and design. The State points to evidence that Jordan was fleeing when he was shot as evidence of appellant's forethought in shooting him. The State cites *State v. Harris*, 2017-Ohio-2751, ¶ 38, where this court affirmed an aggravated-murder conviction based on prior calculation and design.

{¶ 68} The State simply cites *Harris* but does not explain how *Harris* supports a finding of prior calculation and design in this case. In any event, we find the case to be distinguishable. In *Harris*, a passenger was riding the bus when he overheard a group that included Harris discuss robbing him. Harris and the passenger got off at different bus stops but saw each other a short time later; both men were accompanied by friends. The victim, who was friends with the passenger, saw Harris's group and began to yell at them asking them if they wanted to fight. The passenger's group pursued Harris's group at least a few blocks, exchanging words. At one point, Harris and his friends retrieved a gun from a backpack and Harris took possession of the gun. Harris shot at the passenger's group twice, the second bullet hitting the victim in the hand. The victim retreated, and after a period

of 10-15 seconds, Harris approached the victim, who had hidden behind a tree, and shot him twice more, killing him. *Id.* at ¶ 13.

{¶ 69} Although there was no evidence that Harris knew the victim, this court found that there was sufficient evidence of prior calculation and design because of the extended chase, because Harris took possession of the gun from a hidden place (the backpack), and because Harris decided to pursue the victim after he had already shot him twice, despite the victim's attempt to retreat or hide. *Id.* at ¶ 45.

{¶ 70} Harris was squarely in the middle of the events starting with the bus ride and the threats made there, continuing with the confrontation and pursuit by the passenger and his group (which included the victim) in anger over the robbery threats on the bus, continuing with Harris's retrieval of the gun and firing it at the victim from a distance, and then culminating with Harris's continued pursuit of the victim and shooting him again at close range after the victim had already been hit and was hiding behind a tree. These facts and circumstances describe a prolonged and escalating encounter in which the shooter was involved in all events, and which progressed, with increasing intensity, and with sufficient time for studied consideration of whether to escalate or disengage.

{¶ 71} In this case, however, there was no preceding "initial confrontation" between appellant and Jordan. There was no evidence presented that the men knew each other or that appellant knew that Jordan was in the apartment. The evidence presented at trial is devoid of any premeditated decision, advance reasoning, or

studied consideration but, instead, was a spur-of-the-moment eruption of violence that occurred during a drug-and-alcohol fueled night.

{¶ 72} In *Harris*, this court noted that the Ohio Supreme Court has declined to uphold findings of "prior calculation and design" in "explosive, short-duration situations." *Id.* at ¶ 40. *See Walker*, 2016-Ohio-8295; *State v. Reed*, 65 Ohio St.2d 117 (1981) (after a botched theft, accused shot a pursuing civilian and police officer); *see also State v. Mulkey*, 98 Ohio App.3d 773 (10th Dist. 1994) (street-gang attack on victim); *State v. Davis*, 456 N.E.2d 1256 (8th Dist. 1982) (excluded patron shot bar owner and doorman).

{¶ 73} The dissent relies on three older Ohio Supreme Court cases, *Cotton*, 56 Ohio St.2d 8 (1978), *State v. Palmer*, 80 Ohio St.3d 543 (1997), and *State v. Goodwin*, 84 Ohio St.3d 331 (1999). All are distinguishable. In *Cotton*, the Court concluded that the defendant acted with prior calculation and design when, after a botched forgery attempt, the defendant wrestled a gun from a police officer, fired shots at pursuing police and returned to the scene to kill an officer he had already wounded as the officer attempted to crawl away. The Court noted that there was the presence of sufficient time and opportunity between the appearance of the police officers on the scene and the fatal shot at one of the officers for the planning to constitute prior calculation and that "the circumstances surrounding the firing of the non-fatal shots and the circumstances surrounding the firing of the last shot justify a finding of design." *Id.* at 11.

{¶ 74} In *Palmer*, the Court found evidence of prior calculation and design when the defendant, who was a passenger in his friend's ("Hill") car that had been involved in an accident with a truck, got out of the car with a loaded revolver that was cocked and ready to fire and shot the truck driver multiple times, killing him. Prior to the defendant exiting the car, Hill had already exited and began arguing with the truck driver. The defendant testified that the argument continued as he got out of the car. The truck driver attempted to grab Hill, and the defendant swung at him. He then shot the driver three times, hitting him twice. The Court determined that the any rational juror could find that the defendant acted with prior calculation and design because the defendant got out of the car with the pistol cocked and ready to fire and then had to pull back and cock the hammer mechanism before each subsequent shot. *Id.* at 568-569.

{¶ 75} In *Goodwin*, the defendant planned to rob a convenience store. He recruited two friends to assist him. The defendant entered the store armed. When the clerk put his hands up, the defendant shot him once, execution style, through the head. The Court determined that "[i]t is quite clear that appellant planned the robbery and the murder was used to further his plan. It was an action that required thought on his part to place the gun at the victim's forehead, and he took additional time to decide to pull the trigger in order to carry out a calculated plan to obtain money from the store." *Id.* at 344.

{¶ 76} Here, there was no evidence of a drawn out thought process, as there was in *Palmer*, or a return to the scene like in *Cotton*, or a murder that was used to further a planned robbery as in *Goodwin*.[4]

{¶ 77} In a more recent case from the Ohio Supreme Court, *Walker*, 2016-Ohio-8295, the Court affirmed this court's finding that the appellant did not act with prior calculation and design. In that case, the appellant and the victim did not know each other. A bar fight broke out, and the appellant shot the victim once during the fight, killing him. In analyzing the video surveillance and witness testimony in *Walker*, the Court noted that the appellant was obscured behind a pillar for approximately 20 seconds before the gunshot. *Id*. at ¶ 26. The *Walker* Court concluded that while a jury "could reasonably infer that during that time, Walker decided to kill [the victim] by shooting him, it could not reasonably infer that he planned the murder beforehand with prior calculation and design." *Id*. Here too there was no evidence that appellant and Jordan knew each other, that appellant gave any thought as to choosing the location (evidenced by appellant's lack of knowledge that Jordan was at the apartment), or that he planned the murder.

{¶ 78} Again we are reminded that "there are no hard and fast factors to be applied to each case. Nor is there a precise formula to be used when considering those facts. Rather, a case-by-case method must be employed." *Goodwin* at *id*. That

---

[4] The *Palmer* Court described the shooting as an execution-style shooting. *Id*. at 563. Despite the dissent's contention that this too was an execution-style shooting, if the State's witnesses are to be believed, Finklea was above Jordan and not at close range when the shot was fired.

is what we have done here.  Viewing the evidence in a light most favorable to the State, we find insufficient evidence of the elements of aggravated murder, prior calculation and design.  Therefore, appellant's conviction on Count 1, aggravated murder, is vacated.

**Sufficient Evidence of Aggravated Burglary, R.C. 2911.11(A)(2), and Aggravated Murder, R.C. 2903.01(B)**

{¶ 79} Although there was insufficient evidence to support the aggravated-murder charge pursuant to R.C. 2903.01(A), we find there was sufficient evidence to support appellant's conviction for aggravated burglary under R.C. 2911.11(A)(2) and aggravated murder under R.C. 2903.01(B).

{¶ 80} We first consider whether there was sufficient evidence to support the aggravated-burglary conviction.  Appellant was charged with aggravated burglary pursuant to R.C. 2911.11(A)(2).  His indictment reads as follows:

> [Appellant] did, by force, stealth, or deception, trespass, as defined in section 2911.21(A)(1) of the Revised Code, in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when Lee Jordan Jr., a person other than the accomplice, was present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure a criminal offense, to wit: Aggravated Murder and/or Murder and/or Felonious Assault, 2903.01 and or/2903.02 and/or 2903.11(A)(1) and/or 2903.11(A)(2), and the offender had a deadly weapon or dangerous ordnance, to wit: firearm, on or about his person or under his control.

{¶ 81} Thus, the State had to show sufficient evidence that appellant: (1) by force, stealth, or deception; (2) trespassed; (3) in an occupied structure

(4) when Jordan was present; (5) with the purpose to commit a criminal offense, namely aggravated murder, murder, and/or felonious assault.

{¶ 82} Appellant argues that there was no evidence that he entered with "force, stealth, or deception." We agree with appellant that there was inconsistent testimony on whether the apartment door was open or closed when he entered the apartment. Williams testified that the apartment door was locked and that Raymell must have unlocked the door to let the men in. She also testified that she did not know that Raymell's brother was coming to get him and did not invite any of the men into her apartment. Raymell testified that the door was "cracked open," but later testified that Williams had "probably" locked the apartment door. Leon testified the door was wide open when they entered the apartment.

{¶ 83} "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. R.C. 2901.01(A)(1). The element of force is satisfied by "any effort physically exerted." *State v. Spells*, 2024-Ohio-6052, ¶ 39 (2d Dist.), citing *State v. Johnson*, 2017-Ohio-5498, ¶ 21 (2d Dist.). Ohio courts, including this one, have observed that the element of force is met when a person opens an unlocked door to trespass into a home. *See State v. Erker*, 2019-Ohio-3185 (8th Dist.) (the opening of a closed but unlocked door amounts to sufficient force to prove the element of force in the offense of burglary); *State v. McWilliams*, 2001 Ohio App. LEXIS 4601 (2d Dist. Oct. 12, 2001) (opening a closed but unlocked door amounts to sufficient force to prove the element of force).

{¶ 84} Williams's testimony that the door was closed when the men entered the apartment, viewed in a light most favorable to the prosecution, is sufficient evidence that appellant used force to enter the apartment. *See State v. Caraballo*, 2008-Ohio-5248, ¶ 30 (8th Dist.) (victim's testimony alone, viewed in a light most favorable to the prosecution, is sufficient to place appellant in the home for the purpose of trespass). Thus, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the force element was met.

{¶ 85} Appellant also argues that there was insufficient evidence to support the element of trespass. R.C. 2911.21 defines criminal trespass, in relevant part, as: "(A) No person, without privilege to do so, shall . . . Knowingly enter or remain on the land or premises of another."

{¶ 86} Contrary to appellant's argument, there was evidence introduced at trial that appellant entered Williams's apartment without the privilege to do so. Williams testified that she did not invite appellant into her apartment; in fact, she had no idea Raymell's brother was on his way to pick him up. Raymell also could not give appellant permission to enter Williams's apartment because Raymell's privilege to be in the apartment was revoked when Williams told him to leave.

{¶ 87} Appellant claims he never "entered" the apartment. But, during his police interview, appellant twice stated that "everyone went inside" the apartment. The evidence of his entrance into the apartment was corroborated by his DNA, which was found on the interior doorknob of the door the men used to enter the apartment.

{¶ 88} Appellant argues that there was insufficient evidence that he had any criminal intent when he entered the apartment. The indictment stated that appellant trespassed with the purpose to commit "a criminal offense, to wit: aggravated murder and/or murder and/or felonious assault." Thus, the State was required to show that appellant "invaded the dwelling for the purpose of committing a crime or that he formed that intent during the trespass." *State v. Gardner*, 2008-Ohio-2787, ¶ 33, citing *State v. Fontes*, 87 Ohio St.3d 527 (2000), syllabus (To be guilty of aggravated burglary, "a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass.").

{¶ 89} Although we found that appellant did not act with the requisite prior calculation and design to support a conviction for aggravated murder, a reasonable juror could infer that appellant formed the purpose to commit a criminal offense when he entered the apartment, while in the apartment, or when chasing Jordan after he left the apartment.

{¶ 90} Appellant argues that he could not be convicted of aggravated burglary because the shooting occurred outside of the apartment. This claim is meritless; the State only had to show that appellant formed the purpose to commit a crime when he trespassed in the apartment or during the course of the trespass. The sequence of events were one continuous course of conduct; therefore, the State presented sufficient evidence of purpose to commit a criminal act.

{¶ 91} We find sufficient evidence of aggravated burglary.

{¶ 92} Appellant was charged with aggravated murder, under R.C. 2903.01(B). Under R.C. 2903.01(B), the State had to show that appellant purposely caused Jordan's death while committing, or attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary. The indictment read that appellant "did purposely cause the death of [Jordan] while committing, attempting to commit, or while fleeing immediately after committing or attempting to commit the offense of aggravated burglary." The elements of aggravated burglary have already been established, and we find sufficient evidence that appellant purposely caused Jordan's death. We find sufficient evidence of aggravated murder, as charged in Count 2.

{¶ 93} There was insufficient evidence to support appellant's conviction for aggravated murder pursuant to R.C. 2903.01(A) but sufficient evidence to support his convictions for aggravated burglary pursuant to R.C. 2911.11(A)(2) and aggravated murder pursuant to R.C. 2903.01(B). Appellant was denied effective assistance of appellate counsel by counsel's failure to raise an argument as to sufficiency of the evidence for R.C. 2903.01(A) in his initial appeal.

{¶ 94} The first assignment of error is sustained in part and overruled in part.

**Manifest Weight of the Evidence**

{¶ 95} In the second assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.[5]

---

[5] Appellant does not argue that his conviction for having weapons under disability was against the manifest weight of the evidence; therefore, we will not consider that conviction.

{¶ 96} In contrast to a sufficiency argument, a manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387 (1997). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the Ohio Supreme Court recently explained that "[the] court looks at the entire record and 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at 387.

{¶ 97} At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 98} Based on our review of the record, we find that the evidence does not weigh so heavily against a conviction such that the jury clearly lost its way and created a manifest miscarriage of justice by convicting appellant.

{¶ 99} Appellant argues that the jury lost its way in concluding that he was the shooter. He claims that the weight of the evidence showed that Leon was the shooter and that witnesses pinned the shooting on him because he was not "family" and in exchange for favorable sentences. He points to the fact that Leon and Raymell fled the state shortly after the shooting and that this action shows a "consciousness of guilt."

{¶ 100} We agree that there was evidence that Leon was the shooter. Williams testified that Leon was armed. A reasonable juror could conclude that Leon shot Jordan after seeing his brother's condition and his decision to flee the state could indicate a consciousness of guilty, rather than appellant, who had no ties to Jordan or Raymell.

{¶ 101} We also note that in considering Raymell and Leon's testimonies, it is unlikely that the shooting occurred in the manner to which they testified. Raymell testified that appellant was on the landing immediately outside of the door to apartment four when he shot Jordan. Leon testified that appellant was on the steps. The bullet casing recovered from the scene was found on the landing in-between apartment floors. If appellant shot Jordon while on the landing just outside the apartment door, as Raymell testified, one would expect that the bullet casing would be on the landing, or on the stairs leading down to the first floor landing where Jordan was found or on the stairs leading down to the mid-floor landing, but not on the mid-floor landing itself. If appellant shot Jordon while appellant was on the stairs, near the top by the column, as Leon testified, one would expect that the bullet

casing would be on the landing or possibly on the stairs, but not on the mid-floor landing.

{¶ 102} Moreover, the coroner testified that the bullet entered Jordan's skull going from "right to left" in a downward trajectory. It is unlikely that, given where Leon's and Raymell's testimonies put appellant when the shot was fired, that he or anyone could have made that shot.[6]

{¶ 103} We recognize that there was also ample evidence that appellant was the shooter. Multiple people testified that appellant admitted to the shooting — Leon, Raymell, Anthony, and Judge. And there was also physical evidence tying him to the shooting — a bullet casing located in appellant's backyard that matched the casing recovered from the crime scene.

{¶ 104} Additionally, the jury had the chance to review appellant's interview with Det. Hayduk during which appellant was caught in multiple lies and told fanciful tales, some of which were not even related to the shooting.

{¶ 105} Thus, while we acknowledge there were inconsistencies in witness testimony, we do not find that this is the exceptional case in which the evidence weighs heavily against the remaining convictions.

---

[6] The dissent cites to *Jenks*, 61 Ohio St.3d at 273 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), for the proposition that the "relevant inquiry does not involve how the appellate court might interpret the evidence." However, when reviewing the manifest weight of the evidence, this court "sits as the 'thirteenth juror' and may disagree with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387 citing *Tibbs v. Florida*, 457 U.S. 31 (1982).

{¶ 106} Appellant's convictions were not against the manifest weight of the evidence. We also find that appellate counsel was not ineffective for failing to raise this argument in the initial appeal. The second assignment of error is overruled.

**Admissibility of Evidence of Gang Involvement**

{¶ 107} In the third and fourth assignments of error, appellant claims that the trial court committed plain error when it allowed testimony about gang involvement. He further argues that his trial counsel rendered ineffective assistance of counsel for not objecting to the admission of the evidence and the same for appellate counsel, who failed to raise the argument on appeal.

{¶ 108} App.R. 12 states that an appellate court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." Appellant has combined the third and fourth assignments of error in his appellate brief. While an appellate court may combine assigned errors for review and disposition, an appellant may not do the same. This court could summarily overrule appellant's third and fourth assigned errors. Recognizing, however, that cases are best decided on their merits, we will address the alleged errors.

{¶ 109} Raymell and Leon testified that Jordan was a high-ranking member of the Heartless Felons, a notorious street gang. They also testified that a bounty was placed on their heads after the shooting by a Heartless Felon gang leader, and this is why they fled Ohio.

{¶ 110} Appellant claims that the brothers' testimony was prejudicial and denied him a fair trial. But appellant failed to object to the testimony at issue; therefore, he has waived all but plain error with regard to the admission of that testimony. *State v. Rodgers*, 2023-Ohio-734, ¶ 76 (2d Dist.), citing *State v. Wilson*, 2023-Ohio-27 (2d Dist.). Plain error exists when there is an obvious defect in the trial proceedings that affected the outcome of the trial. *Rodgers* at *id.*, citing *State v. Petticrew*, 2023-Ohio-159 (2d Dist.).

{¶ 111} There is nothing in the record indicating that the outcome of the trial would have been different had the testimony at issue not been heard. The testimony was admissible under the theory it explained why the brothers fled the state; it provided an alternative explanation to their decision to leave Ohio. Even if we were to find that the testimony was inadmissible, appellant has failed to show how the testimony prejudiced him. There was no evidence that appellant was gang-affiliated or that Jordan's killing was gang-related. Again, the testimony was that the victim was gang-related and that members of the gang were looking for the brothers to retaliate against them, not appellant.

{¶ 112} Accordingly, because appellant has failed to show prejudice and that the outcome of his trial would have been different had the testimony been excluded, trial counsel was not ineffective for failing to object to relevant testimony and appellate counsel was not ineffective for failing to raise the argument on appeal.

{¶ 113} The third and fourth assignments of error are overruled.

{¶ 114} There was insufficient evidence to support appellant's conviction for aggravated murder — Count 1. That conviction is vacated. Additionally, appellate counsel was ineffective for failing to raise this in his direct appeal. There was sufficient evidence to support his conviction for aggravated murder — Count 2 — and aggravated burglary. None of appellant's convictions were against the manifest weight of the evidence. The trial court did not commit plain error when it allowed testimony about the victim's or witnesses' alleged gang involvement, and trial counsel was not ineffective in failing to object to the same. Accordingly, appellate counsel was not ineffective for failing to raise any of these issues in appellant's initial appeal.

{¶ 115} Judgment is vacated in part and affirmed in part. Because the trial court merged appellant's convictions on Counts 1, 2, 4, and 5 for sentencing and we vacated the conviction for Count 1, the case is remanded for the State to elect the count upon which the appellant shall be sentenced.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EMANUELLA D. GROVES, P.J., CONCURS;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY IN PART AND DISSENTS IN PART


MARY J. BOYLE, J., CONCURRING IN JUDGMENT ONLY IN PART AND DISSENTING IN PART:

{¶ 116} I respectfully dissent in part, because it is my view that the State presented sufficient evidence that appellant murdered Jordan with prior calculation and design when appellant traveled with Leon and Judge to Williams's apartment to "pick up" Raymell, walked up four flights of stairs with a gun in tow, tried to shut everyone in the apartment, and then chased a fleeing Jordan down multiple flights of stairs killing him with one shot to the back of his head. Furthermore, I would find that the appellant's conviction in Count 1 was not against the manifest weight of the evidence and that appellant's counsel was not ineffective for deciding not to raise these issues on direct appeal. Therefore, I would affirm appellant's conviction for aggravated murder in Count 1. Finally, I concur in judgment only with the majority's opinion affirming appellant's convictions on Counts 2-7.

**Sufficiency of the Evidence**

{¶ 117} Our focus as the reviewing court in a sufficiency-of-the-evidence challenge is the burden of production, not the burden of persuasion. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). Indeed, our review is limited. We do not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins,* 78 Ohio St.3d at 387; *State v. Seymour*, 2026-Ohio-1249, ¶ 15 ("A court does 'not ask whether the evidence should be believed but, rather, whether the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."'"), quoting *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus. Importantly, it falls to the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *State v. Jones*, 2021-Ohio-3311, ¶ 16. It also must be kept in mind by the appellate court that the jury heard all of the evidence and was instructed as to the law and as a result found the accused guilty beyond a reasonable doubt. *State v. Biros*, 78 Ohio St.3d 426, 448 (1997). Moreover, the relevant inquiry does not involve how the appellate court might interpret the evidence. *Id.* Thus, we are to determine whether the State set forth sufficient evidence of prior calculation and design, and it is my opinion that the State has met its burden of production.

## Aggravated Murder — Prior Calculation and Design

{¶ 118} Appellant was convicted after a jury trial of aggravated murder under R.C. 2903.01(A), as charged in Count 1, which prohibits a person from purposely, and with prior calculation and design, cause the death of another. Accordingly, to find appellant guilty of murder under this provision, the trier of fact would have to conclude that the appellant purposely, and with prior calculation and design, caused the death of Jordan. A person acts "purposely" when it is his specific intention to cause a certain result. R.C. 2901.22(A). Although the Revised Code does not define "prior calculation and design," the Ohio Jury Instructions synthesizes the relevant case law and sets forth a boilerplate instruction in *Ohio Jury Instructions,* CR § 503.01 (Rev. Feb. 9, 2019), which was used in this case. The trial court instructed the jury as follows:

> Prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have been included — must have included a mental plan involving studied consideration of the method and the means or instrument with which to cause the death of another.

> To constitute prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated design to cause the death.

> No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.

(Tr. 1344-1345.)

{¶ 119} As the jury instructions stated, when construing the element of "prior calculation and design," the Ohio Supreme Court has held that it requires "'advance reasoning to formulate the purpose to kill.'" *State v. Jones*, 2021-Ohio-3311, ¶ 17, quoting *Walker*, 2016-Ohio-8295, ¶ 18. However, the Ohio Supreme Court has also emphasized that "[t]here is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill — each case turns on its own facts." *Id.*, citing *Walker* at ¶ 19. Recently, in *State v. Roberts*, the Ohio Supreme Court stated that

> instantaneous deliberation is not sufficient to constitute "prior calculation and design." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). But this does not mean that a considerable amount of time must lapse between formulating the plan and committing the murder. "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley*, 2001-Ohio-1340, ¶ 59, 93 Ohio St. 3d 253, 754 N.E.2d 1129, or when the evidence shows that the killer "went beyond a momentary impulse and show[s] that he was determined to complete a specific course of action," *State v. Conway*, 108 Ohio St. 3d 214, 2006-Ohio-791, ¶ 46, 842 N.E.2d 996. Even the "nature of the attack" can show prior calculation and design. *State v. Cassano*, 96 Ohio St. 3d 94, 2002-Ohio-3751, ¶ 81, 772 N.E.2d 81.

*Id.*, 2025-Ohio-5120, ¶ 145.

{¶ 120} Under the sufficiency standard of review, the question is whether the State met its burden of production that appellant "'acted with advance reasoning and purpose to kill.'" *State v. Nicholson*, 2024-Ohio-604, ¶ 51, quoting *Jones* at ¶ 2. "And when the evidence presented at trial 'reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme

designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.'" *Roberts* at ¶ 146, quoting *Cotton* at paragraph three of the syllabus.

**Evidence Presented that Establishes Prior Calculation and Design**

{¶ 121} The majority opinion draws the conclusion that the shooting was a "sudden eruption of events, completely unexpected and unanticipated," thus, deciding that the State did not produce sufficient evidence to establish prior calculation and design. (Majority ¶ 64.) This conclusion, however, disregards much of the evidence presented at trial. Indeed, when reviewing sufficiency of the evidence, this court must examine *all* the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable factfinder of the defendant's guilt beyond a reasonable doubt. (Emphasis added.) *State v. Williams*, 2023-Ohio-2296, ¶ 81 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d at 390. I believe the majority disregards evidence presented by the State that, when viewed in a light most favorable to the State, establishes beyond a reasonable doubt that appellant committed this murder with prior calculation and design. By disregarding evidence that was presented at trial, I believe the majority improperly weighed the evidence in order to reach the conclusion the majority desired. That is not our task.

{¶ 122} I believe the following evidence, which was presented at trial, establishes prior calculation and design.

{¶ 123} Initially, it is important to note that the evidence at trial established that on the day of the murder, Raymell was 37 years old, Leon was 33 years old,

appellant was 45 years old and Jordan was 35 years old.[7] These are grown men, not teenagers.[8] In addition, Leon and Raymell were charged as codefendants; however, both pled guilty to reduced charges. Leon pled guilty to involuntary manslaughter, burglary, and obstruction of justice in exchange for his testimony at trial. And Raymell pled guilty to obstruction of justice in exchange for his testimony at trial. Keeping these facts in mind, I believe the following evidence is significant in determining whether the State met its burden of production regarding the element of prior calculation and design.

{¶ 124} In this case, Raymell testified that while he was on the phone with his mother asking for a ride, Williams was "flipping out," "getting aggressive," and punching him. (Tr. 865 and 944-945.) He testified that he pushed Williams away, which caused Jordan to get involved. Then all three got into a "little altercation." (Tr. 869.) Importantly, this happened while Raymell was on the phone with his mother. In addition, during this phone call, Raymell told his mother that Williams had called her ex-boyfriend who "like[ed] to rob, [and] stick up sh**." (Tr. 944-945.)

---

[7] I reference the age of each individual at the time of the murder because the trial in this case occurred approximately 20 months after the murder. Nevertheless, at the time of trial, Raymell testified that he was 38 years old. (Tr. 854.) Leon testified that he was 34 years old. (Tr. 1080.) The autopsy of Jordan established that he was 35 years old at the time of his death. (State's exhibit No. 400.) Finally, during appellant's interview with the detective, which was played for the jury, appellant stated that he was 45 years old, and his date of birth was provided in state's exhibit No. 434. (State's exhibit No. 270, Interview.)

[8] I characterize these individuals as "grown men" because they are well past the age of majority.

He wanted her to know, "in case something happen[ed]" to him.  (Tr. 944.) Raymell's mother then called Leon, Raymell's brother.

{¶ 125} Leon confirmed that their mother called him and said, "Go pickup your dumb a** brother. [Raymell] and his girlfriend are fighting." (Tr. 1091.) While Leon downplayed his mother's state of mind at trial by describing her as agitated or tired, in appellant's statement to the detective, appellant described overhearing Leon's mother shouting, "Baby, baby . . . where you at?  Where you at?  They over there . . . beating up . . . Raymell. . . They beating him down real, real bad." (State's exhibit No. 270.)  In his statement, appellant reiterated that he heard a lot of people were "jumping on Raymell."

{¶ 126} Appellant also stated that Leon ran out of the house after the call, contrary to Alyscia's testimony that Leon was calm and did not seem upset when he went to get Raymell.  Appellant's statement also contradicts Leon's testimony that he got Raymell because he happened to be on the way to buy more drugs.  Notably these events happened at approximately 4:00 a.m.

{¶ 127} Additionally, according to appellant, when he spoke with Leon after the shooting, he said, "that sh** not supposed to be like that [it happened] all because of your mama." (State's exhibit No. 270.)  He also told Raymell that this all started because of him and his mother.

{¶ 128} The foregoing evidence alone is sufficient for the jury to infer that the three men went over to Williams's apartment with the motive and intent to kill

whoever was assaulting Raymell. Nevertheless, there is still more evidence establishing that the three men did not merely intend to give Raymell a ride.

{¶ 129} For instance, Williams testified that she did not know Leon was getting Raymell until she heard a noise coming through her door. She testified, "[i]t was just like a lot of yelling and [I] just heard 'what's up?'" (Tr. 561.) She testified that Leon and two other men, which was later learned to be Judge and appellant, "[c]ame in loud." (Tr. 564.) They were "mad or angry or something." (Tr. 564.) Leon came in first with a gun on his hip. Importantly, one of the men with Leon, which was later learned to be appellant, also had a gun — in his hand — and Williams testified that she thought "they about to kill us." (Tr. 578.)

{¶ 130} Williams also testified that there was no confrontation when the three men arrived. She stated that Jordan immediately ran toward the front door. Williams testified that the male that was later learned to be the appellant "[tried] to shut us all inside." (Tr. 579.) Jordan, however, was able to get out of the door and the male who was later learned to be appellant ran after Jordan. "They all was chasing [Jordan]." (Tr. 580.) Then Williams observed Leon and the male who was later learned to be appellant pointing their guns at Jordan. She heard the shot. She ran and hid in her closet with her dog and told her sister, who was on FaceTime with her, that they were about to kill her and she needed help.

{¶ 131} On cross-examination, Raymell was questioned, "[W]as your ride coming up into the apartment?" Raymell responded, "No. They supposed to call me when they was outside, call me when they was outside." (Tr. 954.) He testified that

"[i]t surprised [him] when two other [men] came in . . . [Leon] always come by hisself . . . He normally be by hisself when he come pick me up." (Tr. 969.) With regards to Jordan running out, Raymell testified that "I probably would have ran out too if I seen three dudes come in." (Tr. 969.)

{¶ 132} As the State argued, "[w]hat is clear is that appellant did not merely come to the door with weapons to greet others. Instead, the only reason why the appellant would come to the door at all, again, with a gun was to, at minimum, intimidate those inside or cause some direct harm." (Appellee-State's brief, p. 17.) When viewing all of the evidence in a light most favorable to the State, any rational trier of fact could infer from Williams's and Raymell's testimony that the three men came into the apartment intent on killing whoever was in there, which was exactly the feeling Williams described and Jordan clearly assumed when he fled the apartment. This inference is bolstered by the fact that Leon's and appellant's guns were visible, they came in angry, and appellant tried to shut them in the apartment.

{¶ 133} Furthermore, when police arrived on scene, officers observed Williams draped over Jordan's body, sobbing. The bodycam footage depicts Williams crying hysterically and screaming that "he just walked up to him and shot him in the f***ing head!" (State's exhibit No. 228.) She said it happened so fast; it happened in "the blink of an eye." She yelled, "[T]hey bum rushed my house. . . [Raymell] set me up . . . shot my brother [Jordan] in the head!" (State's exhibit No. 228.)

{¶ 134} Williams's immediate reaction to the murder was that Raymell set her up and the three men came over and ambushed them intending to kill them, hence the fact that Jordan fled and Williams hid in her closet. This is a perfectly reasonable conclusion when three grown men "bum rushed" her apartment with guns. The jury drew the same conclusion.

{¶ 135} Finally, the video surveillance depicts Leon, Judge, and appellant exiting the vehicle, which is left running, while they enter Williams's apartment building. (State's exhibit No. 231.) Within 15 seconds of all three entering, Jordan can be observed in the hallway window running down the stairs. Approximately 20 seconds later, appellant exits the apartment and jogs to the vehicle. Then Leon exits and holds the door open, while Judge exits. Raymell exits soon thereafter. They drive away. None of the men helped Jordan or called 9-1-1. They left him crumpled at the bottom of the stairs with a bullet to the back of his head.

{¶ 136} The majority reasons that there was no evidence that appellant and Jordan knew each other, that appellant gave any thought as to choosing the location, or that he planned the murder citing the *Taylor* factors as proof that there was no evidence of prior calculation and design. I disagree.

{¶ 137} In *Taylor*, the Ohio Supreme Court explained that the following factors were to be considered when determining the existence of prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost

spontaneous eruption of events'?" *Taylor*, 78 Ohio St.3d at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99 (8th Dist. 1976). Nevertheless, the *Taylor* Court concluded that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *Id.* at 20.

{¶ 138} Indeed this court has stated that the State may prove "prior calculation and design" from "'the circumstances surrounding a murder in several ways: (1) evidence of a preconceived plan leading up to the murder, (2) evidence of the perpetrator's encounter with the victim, including evidence necessary to infer the defendant had a preconceived notion to kill regardless of how the [crime] unfolded, or (3) evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill.'" *State v. Orr*, 2014-Ohio-4680, ¶ 75 (8th Dist.), quoting *State v. Dunford*, 2010-Ohio-1272, ¶ 53 (11th Dist.), citing *State v. Trewartha*, 2005-Ohio-5697 (10th Dist.). "Furthermore, the execution-style mode indicates conformance with a plan, not simply an 'explosive, short-duration situation.'" *Id.*, citing *Taylor* at 17-18.

{¶ 139} Here, although the appellant did not know Jordan specifically,

> appellant entered [Williams's] apartment with two others, [Judge] and Leon. They did so after being called by Raymell to come pick [Jordan] up after he had gotten into an altercation with [Jordan]. Appellant was aware of who [Jordan] was and believed that the [Jordan] physically harmed Raymell. Appellant pursued [Jordan] with intent to cause harm and deliberately executed Jordan with a single gunshot to the head.

(Appellee-State's brief, p. 16-17.) When viewing the evidence in a light most favorable to the State, it may be inferred from the surrounding circumstances that whoever was assaulting Raymell was the target of Leon's, Judge's, and appellant's wrath. Furthermore, it may be inferred from the evidence that the three men had a preconceived notion to kill whoever was assaulting Raymell because they arrived together with guns and attempted to shut Jordan and Williams in the apartment. Finally, when appellant was unable to lock Jordan and Williams in the apartment appellant, Leon, and Judge chased Jordan down the stairs and appellant shot Jordan in the back of the head at relatively close range.

{¶ 140} After reviewing all of the evidence presented at trial, I believe, as did the jury, that the State presented sufficient evidence that appellant, Leon, and Judge had motive to kill and planned to kill whoever was assaulting Raymell. The majority's conclusion that "appellant being along for the ride appears to be happenstance," is one interpretation of the evidence presented. (Majority ¶ 59.) However, I believe that this is viewing the evidence in a light most favorable to the defense, which is not the standard. When viewing the evidence in a light most favorable to the State, the jury could conclude that appellant did not remain in the vehicle with the women because there was a plan to kill the person assaulting Raymell because the evidence presented at trial demonstrates that appellant chose to accompany Leon, chose to get out of the vehicle, chose to bring his gun, chose to climb four flights of stairs, chose to enter the apartment, chose to brandish his gun, chose to attempt to lock everyone in, chose to run after Jordan, chose to shoot him

in the back of the head, chose to leave the scene, chose to hide the gun, and chose to not call police. Each one of those choices demonstrates that the appellant went beyond a momentary impulse and proved that he was determined to complete a specific course of action, which was to execute whoever was assaulting Raymell.

{¶ 141} The majority asserts that my

> theory supporting prior calculation and design, which was never advanced by the State, is that appellant formulated a plan to kill Jordan, but both Raymell and Leon testified regarding their surprise and anger after the four men returned to the car, evidencing that it was not a planned homicide.

(Majority ¶ 65.) By drawing this conclusion, however, I believe that the majority weighed Raymell's and Leon's testimony against Williams's testimony that they came in angry and she thought they were about to kill them, as well as all the evidence admitted regarding the execution of Jordan, and the majority decided that Raymell's and Leon's testimony, that it was unplanned, is the only inference that may be drawn. By contrast, Williams testified that she believed that they were about to kill them. In addition, a rational juror may infer from Jordan fleeing the apartment that he felt his life was in imminent danger of death because he was outnumbered by men with guns. And finally, the jury ascertained or inferred from the surrounding facts and circumstances that the three men planned to kill Jordan, which was evidenced by the jury's verdict. Again, weighing the evidence is not our task when reviewing sufficiency of the evidence. *State v. Beasley*, 2018-Ohio-493, ¶ 207 ("Evaluation of the witnesses' credibility is not relevant to a sufficiency analysis.").

{¶ 142} The majority also states that there is "no evidence presented that there was even a suggestion during the drive over to William's apartment that anyone was planning on killing Jordan." (Majority ¶ 60.) Direct evidence, however, is not required to establish prior calculation and design, because the elements of an offense may be proven by direct or circumstantial evidence. *State v. Wingfield*, 2019-Ohio-1644, ¶ 51 (8th Dist.). Indeed, the Ohio Supreme Court just reiterated that

> Sufficiency-of-the-evidence review is not limited exclusively to testimony and other forms of direct evidence. See *State v. Dunn*, 2024-Ohio-5742, ¶ 28, 32, 177 Ohio St. 3d 555, 253 N.E.3d 117. We regularly consider circumstantial evidence, which is "'sometimes defined as proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind,'" *State v. Roberts*, 2025-Ohio-5120, ¶ 140, quoting *State v. Griffin*, 13 Ohio App.3d 376, 377, 13 Ohio B. 458, 469 N.E.2d 1329 (1st Dist. 1979), in sufficiency-of-the-evidence review. See, e.g., *Dunn* at ¶ 35-37. We have also emphasized that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," *Jenks*, 61 Ohio St.3d at 272, and—in practice— "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence," *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991), citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S. Ct. 6, 5 L. Ed. 2d 20 (1960). *Our precedent thus makes clear that an appellate court does not conduct proper sufficiency-of-the-evidence review if it turns a blind eye to circumstantial evidence in the record.*

(Emphasis added.) *Seymour*, 2026-Ohio-1249, ¶ 18. Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). Circumstantial evidence is evidence that requires "the drawing of

inferences that are reasonably permitted by the evidence." *Id.* Direct and circumstantial evidence are of equal evidentiary value. *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.). "[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design." *State v. Hough*, 2010-Ohio-2770, ¶ 19 (8th Dist.). Neither a written manifesto nor direct testimony describing the plan is required to prove prior calculation and design.

{¶ 143} Based on the evidence in this case, any rational trier of fact could infer from the surrounding facts and circumstances that the three men planned to kill whoever was assaulting Raymell because it does not take three grown men and two guns to retrieve a grown man from his on-again, off-again girlfriend's apartment. In fact, this is supported by Raymell's testimony, that Leon was supposed to call him when he was outside

{¶ 144} Nevertheless, even if I agreed with the majority's interpretation of the evidence that "appellant formed the purpose to commit a criminal offense when he entered the apartment, while in the apartment, or when chasing Jordan after he left the apartment," I believe any of those scenarios establishes sufficient time to formulate a plan to kill Jordan. (Majority ¶ 89.) Indeed, the Ohio Supreme Court has upheld findings of prior calculation and design "in short-duration emotional situations." *State v. Harris*, 2017-Ohio-2751, ¶ 38 (8th Dist.).

{¶ 145} For instance, in *State v. Goodwin*, 84 Ohio St.3d 331, 344 (1999), the Court found that the defendant's act during a robbery of placing the gun to the

victim's head in furtherance of a robbery demonstrated prior calculation and design because of the time between that act and pulling the trigger. The Court noted that the act of placing the gun to the victim's forehead required thought by the defendant, and the fact that the defendant took the additional time to decide to pull the trigger in order to carry out the planned robbery, demonstrated that it was not a spur-of-the-moment accidental shooting on the part of the defendant. *Id.* at 344.

{¶ 146} Likewise in *Cotton*, 56 Ohio St.2d 8 (1978), defendant attempted to pass a fraudulent check. When officers arrived, the defendant fled with the officers in pursuit. One officer caught up with the defendant, and a scuffle ensued, at which time the defendant grabbed the officer's gun and fired two shots wounding both officers. Both officers were unable to move. Then the defendant steadied the weapon and fired the fatal shot, a fact of consequence for the prior calculation and design consideration. *Id.* at 11. The Ohio Supreme Court concluded that those facts demonstrated sufficient evidence of prior calculation and design based on the short time between the officer's arrival and the defendant's conduct in murdering one of the officers. *Id.*

{¶ 147} Similarly, in *Palmer*, 80 Ohio St.3d 543 (1997), the Supreme Court explained that sufficient evidence of prior calculation and design existed when, after being involved in a minor accident with a pickup truck, the defendant exited the vehicle with a loaded revolver that was cocked and ready to fire and shot the truck's driver twice in the head. *Id.* at 543 and 568. Although the killing took only moments, the Court concluded that "[t]he evidence, when viewed in a light most

favorable to the state, was more than sufficient to show that [the defendant] had adopted a plan to kill [the driver] prior to exiting [the] vehicle and that, with a level of precision, [the defendant] followed through on his calculated decision to kill." *Id.* at 569.

{¶ 148} In the instant case, appellant made the decision to stand at the door. He made the decision to hold the gun in his hand, rather than have it on his hip, like Leon did. He allegedly asked Raymell what happened to his face. He then made the decision to attempt to trap Jordan in the apartment. He then made the decision to chase after Jordan and execute him with one shot to the back of the head. Based on this evidence, a jury could infer that appellant "quickly conceived and executed" a plan to kill Jordan. *Coley*, 2001-Ohio-1340, ¶ 59. And that appellant's actions "went beyond a momentary impulse and [demonstrated] that he was determined to complete a specific course of action." *Conway*, 2006-Ohio-791, ¶ 46.

{¶ 149} As the majority points out, multiple people testified that appellant admitted to shooting Jordan, including Leon, Raymell, Anthony, and Judge. Further, Williams testified that the male later learned to be appellant had a gun, that appellant tried to shut everyone in her apartment, and that she observed appellant and Leon pointing their guns at Jordan who was fleeing for his life. Moreover, a bullet casing that matched the casing from the crime scene was recovered from appellant's backyard. The jury heard all the evidence and concluded that appellant purposely caused the death of Jordan with prior calculation and design.

{¶ 150} Finally, the majority asserts that I am violating the "party-presentation principle" alleging that I am "asserting a theory that was not advanced by the [State]," claiming that

> the State never argued that the evidence inferred a plan to kill Jordan, or anyone else, prior to the three men arriving at the apartment building. At trial, the State theorized that appellant developed the plan to shoot Jordan while he was running out of the apartment. On appeal, the State theorized that appellant formulated his plan after he entered the apartment, while Raymell was speaking with Leon.

Although I disagree with the majority's characterization of the State's arguments at trial and on appeal, it makes no difference here because our job is to look at *all* of the evidence presented at trial, not the theories presented at trial or on appeal.[9]

{¶ 151} Thus, after viewing all of the evidence in a light most favorable to the State, I would find that the State produced sufficient evidence of prior calculation and design. I believe that the evidence presented shows that there was sufficient time and opportunity for the planning of the murder and that the evidence also established that appellant went beyond a momentary impulse. Furthermore, after examining the entire record, weighing all the evidence, and considering the credibility of the witnesses, I cannot say that the jury clearly lost its way when finding appellant guilty of aggravated murder as charged in Count 1 of the indictment. Thus, his conviction for aggravated murder as charged in Count 1 of the indictment is not

---

[9] In my view, the State's theory was that appellant purposely caused the death of Jordan with prior calculation and design. Thereafter, the State's only job was to present sufficient evidence to establish all the elements. Opening statements and closing arguments are not evidence; rather, they are the State's theory of the evidence.

against the manifest weight of the evidence. Finally, I would find that appellate counsel was not ineffective.

{¶ 152} Accordingly, I would overrule appellant's first and second assignments of error in their entirety and affirm his convictions.